**[J-82-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | |
|---|---|
| WILLIAM PENN SCHOOL DISTRICT; PANTHER VALLEY SCHOOL DISTRICT; THE SCHOOL DISTRICT OF LANCASTER; GREATER JOHNSTOWN SCHOOL DISTRICT; WILKES-BARRE AREA SCHOOL DISTRICT; SHENANDOAH VALLEY SCHOOL DISTRICT; JAMELLA AND BRYANT MILLER, PARENTS OF K.M., A MINOR; SHEILA ARMSTRONG, PARENT OF S.A., MINOR; TYESHA STRICKLAND, PARENT OF E.T., MINOR; ANGEL MARTINEZ, PARENT OF A.M., MINOR; BARBARA NEMETH, PARENT OF C.M., MINOR; TRACEY HUGHES, PARENT OF P.M.H., MINOR; PENNSYLVANIA ASSOCIATION OF RURAL AND SMALL SCHOOLS; AND THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE—PENNSYLVANIA STATE CONFERENCE, <br><br>        Appellants <br><br>        v. <br><br> PENNSYLVANIA DEPARTMENT OF EDUCATION; JOSEPH B. SCARNATI III, IN HIS OFFICIAL CAPACITY AS PRESIDENT PRO-TEMPORE OF THE PENNSYLVANIA SENATE; MICHAEL C. TURZAI, IN HIS OFFICIAL CAPACITY AS THE SPEAKER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES; TOM WOLF IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE | No. 46 MAP 2015 <br><br> Appeal from the Order of the Commonwealth Court entered on April 21, 2015 at No. 587 MD 2014. <br><br> ARGUED: September 13, 2016 |

COMMONWEALTH OF PENNSYLVANIA; :
PENNSYLVANIA STATE BOARD OF :
EDUCATION; AND PEDRO A. RIVERA, :
IN HIS OFFICIAL CAPACITY AS THE :
SECRETARY OF EDUCATION, :
:
            Appellees :

## OPINION

**JUSTICE WECHT**[1]                                 **DECIDED: September 28, 2017**

Appellant-Petitioners in this case are school districts, individuals, and groups with an interest in the quality of public education in Pennsylvania. They contend that the General Assembly and other Respondents collectively have failed to live up to the mandate, embodied in our Constitution's Education Clause, that the General Assembly "provide for the maintenance and support of a thorough and efficient system of public education."[2] They further allege that the hybrid state-local approach to school financing results in untenable funding and resource disparities between wealthier and poorer school districts. They claim that the General Assembly's failure legislatively to

---

[1]    This case was reassigned to this author.

[2]    *See* PA. CONST. art. III, § 14 ("The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth."). While the constitutional mandate is directed solely to the General Assembly, the remaining Commonwealth Respondents, who raise no specific challenge to their inclusion as parties, are named because Petitioners seek declaratory and injunctive relief that would constrain the executive branch's administration and enforcement of the challenged school financing scheme.

ameliorate those disparities to a greater extent than it does constitutes a violation of the equal protection of law guaranteed by the Pennsylvania Constitution.[3]

The Commonwealth Court, sitting in its original jurisdiction, dismissed both claims at the pleading stage, relying upon this Court's prior dispositions of similar cases.[4] Arguably, these prior decisions held that such challenges to prerogatives constitutionally conferred upon the General Assembly were political questions that the courts cannot adjudicate without infringing upon the constitutional separation of powers. Concluding that these decisions controlled the issues presented, the Commonwealth Court ruled that Petitioners' claims lay outside the reach of the judiciary as non-justiciable political questions pursuant to the principles set forth in *Baker v. Carr*, 369 U.S. 186 (1962), and its federal and Pennsylvania progeny.

It is settled beyond peradventure that constitutional promises must be kept. Since *Marbury v. Madison*, 5 U.S. 137 (1803), it has been well-established that the separation of powers in our tripartite system of government typically depends upon judicial review to check acts or omissions by the other branches in derogation of constitutional requirements. That same separation sometimes demands that courts

---

[3] Petitioners state their equal protection claim solely in terms of Article III, Section 32 of our Constitution, which by its terms proscribes the enactment of "local or special laws" when the circumstance "can be provided for by general law." Unlike the Fourteenth Amendment to the United States Constitution, Section 32 does not speak expressly in terms of equal protection. Nonetheless, we long have gleaned equal protection principles from Section 32, which we have held is substantially coterminous with the federal Equal Protection Clause. *See Balt. & Ohio R. Co. v. Dep't of Labor & Indus.*, 334 A.2d 636, 643 (Pa. 1975) ("[T]he content of the two provisions is not significantly different.").

[4] *See Malone v. Hayden*, 197 A. 344, 352 (Pa. 1938) (hereinafter "the *Teachers' Tenure Act Case*"); *Danson v. Casey*, 399 A.2d 360 (Pa. 1979); *Marrero v. Commonwealth*, 739 A.2d 110 (Pa. 1999) (hereinafter "*Marrero II*").

leave matters exclusively to the political branches. Nonetheless, "[t]he idea that any legislature . . . can conclusively determine for the people and for the courts that what it enacts in the form of law, or what it authorizes its agents to do, is consistent with the fundamental law, is in opposition to the theory of our institutions." *Smyth v. Ames,* 169 U.S. 466, 527 (1898).[5] Thus, we must be skeptical of calls to abstain from a given constitutional dispute. We hold that this is not a case that requires such abstention. Accordingly, we reverse the Commonwealth Court's contrary ruling.

## I. Background

### A. The Pennsylvania Constitution and Public Education[6]

The lineage of charters that led to Pennsylvania's current Constitution offers a window into the shifting priorities and prerogatives animating the Commonwealth's sometimes fractious history. This history informed the introduction and evolution of what became the Education Clause, a provision that has remained in our Constitution in materially the same form since 1874. We choose as a starting point William Penn's 1682 Frame of Government of Pennsylvania. This was Pennsylvania's first charter, "in effect a constitution agreed upon between Penn and the colonists," and "the first real

---

[5] Overruled on other grounds by *Fed. Power Comm'n v. Natural Gas Pipeline Co. of Am.*, 315 U.S. 575 (1942).

[6] The following account draws principally upon section three of Kenneth Gormley, *et al.*'s THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES, the exemplary, unpublished single-judge Commonwealth Court opinion written by the Honorable Dan Pellegrini in *Pennsylvania Association of Rural & Small Schools v. Ridge*, 11 M.D. 1991, slip op. at 86-105 (Cmwlth. Ct. July 9, 1998) (hereinafter "*PARSS*"), *affirmed by PARSS v. Ridge*, 737 A.2d 246 (Pa. 1999) (*per curiam*), and sources cited therein. A copy of Judge Pellegrini's opinion in *PARSS* is appended to Petitioners' brief in the instant appeal. We provide direct citations to these sources only where quotations are drawn from them. Additional intertextual citations refer to sources with which we supplement the above authors' accounts.

[C]onstitution followed in the colony of Pennsylvania." Gormley, *et al.*, *supra* n.6, § 3.2[a] at 33 (hereinafter "RIGHTS & LIBERTIES") (citing Thomas Raeburn White, COMMENTARIES ON THE CONSTITUTION OF PENNSYLVANIA xvii (1907)). Notably, Penn's Framework provided for the creation of schools, and the colonial assembly passed education legislation as early as 1683. William Penn himself stressed that the people should "spare no cost" in providing for education, opining that "by such parsimony all is lost that is saved." *PARSS* at 87 (quoting Philip S. Klein, *et al.*, A HISTORY OF PENNSYLVANIA 384 (2d ed. 1973)). The Framework was short-lived, as Penn issued the Charter of Privileges in 1701, notable for its addition of certain defined individual liberties, and in particular its expansion of religious freedom and concomitant broadening of the electoral franchise, which, in turn, transformed Pennsylvania into a haven for oppressed religious sects. Notably absent from the Charter, though, was any provision concerning education.

Continued economic growth, as well as demographic, economic, and political changes, led to the Pennsylvania Convention of 1776. The Constitution that emerged from the convention, which came to be a model for other state charters, added extensive and now-familiar procedural protections, intra-governmental checks and balances, and a detailed declaration of rights. Education also returned in the 1776 Constitution's mandate that "[a] school or schools shall be established in each county by the legislature, for the convenient instruction of youth, with such salaries to the masters paid by the public, as may enable them to instruct youth at low prices." PA. CONST. OF 1776 § 44.

Aspects of the 1776 Constitution, including in particular its further expansion of the franchise, its unicameral legislature, its weak executive Council of Censors lacking veto power, and a judiciary characterized by the combination of democratic selection and the brevity of judges' terms, provoked conflict among political factions. This led to gridlock, recrimination, and, in due time, the 1789 Pennsylvania constitutional convention, which culminated in the adoption of the 1790 Constitution. The new Constitution divided legislative power into two houses, replaced the Council of Censors with a unitary executive having veto power, and extended life tenure on good behavior to judges who were appointed rather than elected.[7] Like other state constitutions enacted in that era, it resembled in its broad strokes, and in its conception of tripartite representative democracy, the United States Constitution.

The fledgling federal constitution conspicuously omitted any mention of education, which presumably was among the unenumerated powers reserved to the states by the Tenth Amendment.[8] But in Pennsylvania, the Constitution of 1790 preserved generally the 1776 Constitution's educational mandate, refining the language of the earlier clause to direct the legislature "to provide, by law, for the establishment of schools throughout the State, in such manner that the poor may be taught gratis." PA. CONST. OF 1790 art. VII, § 1.

---

[7]    The method of selecting judges in Pennsylvania repeatedly has changed over the years. Presently, the selection of judges by partisan elections, subject to decennial retention elections, reflects changes effectuated in the 1968 Constitution. *See generally* PA. CONST. art. V, §§ 12-15.

[8]    "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend X.

Judge Dan Pellegrini has provided a useful account of how the 1790 Education Clause's mandate was applied in the decades that followed:

Laws effectuating the [1790 Education Clause], passed in 1802, 1804[,] and 1809, allowed parents who declared themselves paupers to receive state aid to pay tuition at private institutions. But the "pauper school" approach reached few children, and as late as 1828, the state had paid the tuition of only 4,477 children that year. Ellwood P. Cubberley, PUBLIC EDUCATION IN THE UNITED STATES 192 (2d ed. 1934). Over half the state's 400,000 children were not enrolled in school. Stuart G. Noble, A HISTORY OF AMERICAN EDUCATION 160 (1938).

The cause of universal public education gained wide support during the 1820s. The Pennsylvania Society for the Promotion of Public Schools, founded in 1827, petitioned for a revision of the state's school laws. None of the governors during the period that the 1809 law was in effect believed that the constitutional mandate was being fulfilled. In his 1823 inaugural address to the state legislature, Governor [John] Schulze stated:

The object of the convention seems to have been, to diffuse the means of rudimental education so extensively, that they should be completely within the reach of all—the poor who could not pay for them, as well as the rich who could. Convinced that even liberty without knowledge, is but a precarious blessing, I cannot therefore too strongly recommend this subject to your consideration.

JOURNAL OF THE THIRTY-FOURTH HOUSE OF REPRESENTATIVES, 1823-24 151-52, quoted in Lawrence A. Cremin, THE AMERICAN COMMON SCHOOL 104 (1951) (hereinafter "AMERICAN COMMON SCHOOL"). George Wolf, another advocate of public education, was elected to two successive terms as governor, beginning in 1829. In his message to the legislature in 1830, Governor Wolf forcefully stated:

Of the various projects which present themselves, as tending to contribute most essentially to the welfare and happiness of a people, and which come within the scope of legislative action, and require legislative aid, there is none which gives more ample promise of success, than that of a liberal and enlightened system of education, by means of which, the light of knowledge will be diffused throughout the whole community, and imparted to every individual susceptible of partaking of its blessings; to the poor as

well as to the rich, so that all may be fitted to participate in, and to fulfil all the duties which each one owes to himself, to God, and to his country. The [C]onstitution of Pennsylvania imperatively enjoins the establishment of such a system. Public opinion demands it. The state of public morals calls for it; and the security and stability of the invaluable privileges which we have inherited from our ancestors require our immediate attention to it.

VI REGISTER OF PENNSYLVANIA 386 (1830), quoted in AMERICAN COMMON SCHOOL 104-105. In his 1831 message to the legislature, Governor Wolf said:

The improvement of the mind should be the first care of the American statesman, and the dissemination of learning and knowledge ought to form one of the principal objects of his ambition. Virtue and intelligence are the only appropriate pillars upon which a [r]epublican Government can securely rest . . . . Under these impressions, no opportunity has been omitted earnestly to press upon the attention of the legislature, the indispensable necessity of establishing by law a general system of common school education . . . .

V PENNSYLVANIA ARCHIVES, FOURTH SERIES 962-64, quoted in Klein & Hoogenboom, A HISTORY OF PENNSYLVANIA [page citation omitted] (2d ed. 1973).

The efforts of the proponents of public education eventually produced results. In 1831, the Report of the House Committee on Education addressed the shortcomings of the pauper school laws:

[T]he unremitted attention of your committee has been directed to the labour of compiling the details of a system of common schools, in which eventually all the children of our [C]ommonwealth may at least be instructed in reading, and a knowledge of the English language, in writing, arithmetic and geography—subjecting them to such regulations as may best promote their future usefulness— securing competent and able teachers, and providing for their support . . . .

VII REGISTER OF PENNSYLVANIA 386 (1830), quoted in AMERICAN COMMON SCHOOL 105. This report contributed to the passage of a bill creating a permanent school fund. During the 1833-34 session, Senator Samuel

Breck was appointed chairman of a joint committee on education which produced a report stating the following:

> A radical defect in our laws upon the subject of education, is that the public aid now given, and imperfectly given, is confined *to the poor*. Aware of this, your committee have taken care to exclude the word *poor*, from the bill which will accompany this report, meaning to make the system *general*, that is to say, to form an educational association between the rich, the comparatively rich, and the destitute. Let them all fare alike in primary schools; receive the same elementary instruction; imbibe the same republican spirit, and be animated by a feeling of perfect equality.

XIII REGISTER OF PENNSYLVANIA 97 (1834), quoted in AMERICAN COMMON SCHOOL 106. The bill accompanying the report was passed into law and created a system of public schools. The act created school districts in every ward, township and borough, which were given the choice of participating in the new system or continuing to operate under the 1809 mandate of providing only for the education of the poor. To participate in the disbursement of state funds, each district was required to raise by local effort an amount twice that to be received from the state.[9]

While the new law was passed almost unanimously and received broad support among the New England settlers of the northern tier counties and the Scotch-Irish Presbyterians of the western counties, opponents rallied

---

9   While, as detailed below, the precise ratio of state funds to local funds comprising the non-federal share of any given school district's budget will vary from one district to the next, it is worth noting that, overall, the two-to-one ratio of local to state funding approximates the overall ratio in effect nearly two hundred years later. However, as one commentator observes, it was not always so:

> The high[-]water mark for [Pennsylvania] state contributions to public education funding was in 1974-75, when the state reimbursed school districts for 55% of their actual instructional expenses. By 2003-04, that figure had dropped to 34%. The shift was not accidental: in 1983, the state legislature removed language from the School Code which held the state to a goal of paying 50% of statewide district instructional costs.

Ann L. Martin, *Comment, Been There, Done That: What Next? Looking Back & Ahead at Litigation Prospects for School Funding Reform in Pa.*, 15 WIDENER L.J. 815, 816 n.6 (2006) (citing The Education and Policy Leadership Center, PENNSYLVANIA EDUCATION FINANCE PRIMER 7 (Nov. 2005)).

to repeal the law in the Senate and almost succeeded in the House. Three groups were allied in their opposition to public education: property owners who opposed the use of taxes to fund the system; religious groups like the [Quakers], the Lutherans and the Mennonites who supported their own parochial schools; and the German-speaking settlers of the east-central counties who were opposed to the English language requirements. Thaddeus Stevens, then a member of the House of Representatives, eloquently spoke in defense of the school act and the supporters of public education were able to prevent the repeal of the law.[10]

*PARSS* at 88-92 (citations modified; footnotes omitted).

It was left to Governor Wolf's successor, Joseph Ritner, and the first Superintendent of Common Schools, Thomas H. Burrowes, to implement the newly-designed system that followed. By 1837, 742 of 987 districts were participating in the state system. The notion of the pauper school had been marginalized, and most parts of the state accepted a tax-based system of public education for all young people.

In its contribution to and convergence with other state charters and the federal constitution, Pennsylvania's 1790 Constitution reflected the animating principles of a burgeoning nation. Nonetheless, simmering conflicts among competing factions, in part reflecting the divergent interests of the Commonwealth's far-flung eastern and western

---

[10] As reflected by the Senate's passage of a repeal bill in 1835, opposition to the 1834 act was widespread and fierce, perhaps costing Governor Wolf his job in the 1835 election and leading to the election of repeal-inclined senators and representatives. Thirty-eight of fifty-one counties sent petitions seeking repeal, and at least two more petitioned for modifications. Only eleven counties refrained entirely from seeking changes to the new act. *The Famous Speech of Hon. Thaddeus Stevens of Pennsylvania in Opposition to the Repeal of the Common School Law of 1834, in the House of Representatives of Pennsylvania, April 11, 1835*, Introduction, at 3, available at https://goo.gl/vZ8GN0 (last reviewed Aug. 28, 2017). Mr. Stevens' entire speech is worthy of review, but among his observations was that, "[i]f education be of admitted importance to the people under all forms of government, and of unquestioned *necessity* when they govern themselves, it follows of course that its cultivation and diffusion is a matter of *public* concern, and a duty which every government owes to its people." *Id.* at 4 (emphasis in original).

populations, led to a successful 1837 popular referendum calling for a constitutional convention. The resulting 1838 Constitution adjusted the structure of government, providing refinements in the protection of rights and the imposition of additional limitations on legislative power. The 1790 Constitution's Education Clause remained unchanged.[11]

Judge Pellegrini continues:

The 1850s saw an expansion of legislative activity concerning education. In 1851, the Pennsylvania Supreme Court ruled that the clause concerning free education for the poor, contained in the education provision of the constitutions of 1790 and 1838, was not a limitation on the power of the legislat[ure]. *Commonwealth v. Hartman*, 17 Pa. 118 (1851). The [C]ourt held that the clause defined the minimum legislative effort and did not enjoin the legislature from doing more. *Id.* In 1852, another staunch supporter of public education, William Bigler, was elected governor. . . . Governor Bigler oversaw an expansion of state efforts in education, which included the establishment of the first state normal schools and the State Teachers' Association and the first publication of the *Pennsylvania School Journal.*

During this period, Pennsylvania was not alone in its efforts to institute a universal system of public education. People like Horace Mann in Massachusetts, Henry Barnard in Connecticut, Samuel Lewis in Ohio, and John Pierce in Michigan led movements advocating publicly-funded universal education. Some states added education clauses to their constitutions or strengthened their commitment to education by passing new legislation. The phrase "thorough and efficient" was first included in

---

[11] Interestingly, as a reflection of the Commonwealth's collective, ongoing commitment to an education that might fairly be called "thorough," delegates to the 1837 convention defeated an amendment that would have added "common" as a modifier to the Education Clause. In the parlance of that era, such language would have purported to restrict the state's obligation to the maintenance only of a system of elementary and middle schools, as we define them today. *See* John Dinan, *The Meaning of State Constitutional Education Clauses: Evidence from the Constitutional Convention Debates*, 70 Alb. L. Rev. 927, 953 (2007) (quoting 5 Pennsylvania Convention of 1837-1838 290-91).

the Education Clause of the Ohio Constitution of 1851 and over the next several decades was added to the Constitutions of Minnesota, Maryland, New Jersey, Pennsylvania and West Virginia. . . .[12]  The phrase can be traced to a lecture Mann delivered in 1840: "[T]he efficient and thorough education of the young was not merely commended to us, as a means of promoting private and public welfare, but *commanded* as the only safeguard against such a variety and extent of calamities as no nation on earth has ever suffered."  Horace Mann, *Lectures on Education*, II LIFE & WORKS OF HORACE MANN 191 (1891).

*PARSS* at 93-94 (citations modified; footnotes omitted).

Pennsylvania did not revisit the Education Clause until the 1873 constitutional convention,[13] when the drafters eliminated the prior clause's focus upon instruction for the poor.  The new clause directed the General Assembly to "provide for the maintenance and support of a thorough and efficient system of public schools, wherein all the children of this Commonwealth above the age of six years may be educated," and specified that the legislature "shall appropriate at least one million dollars each year for that purpose."  PA. CONST. OF 1874 art. X, § 1.  While the 1776, 1790, and 1838 Constitutions recognized education's "vitally important part in our existence," it was only upon the adoption of the 1874 Constitution that Pennsylvania "fortified" the public school

---

[12]  *See* MD. CONST. art. VIII, § 1; MINN. CONST. art. XIII, § 1; N.J. CONST. art. VIII, § 4; W.V. CONST. art. XII, § 1.  In point of fact, in addition to those states, the same language also appeared in the Constitutions of Illinois and Wyoming.  *See* ILL. CONST. art. X, § 1; WYO. CONST. art. VII, § 1.

[13]  This Court previously has observed that the 1874 Constitution "was drafted in an atmosphere of extreme distrust of the legislative body and of fear of the growing power of corporations," and reflected a "prevailing mood . . . of reform."  *In re Commonwealth, Dep't of Transp.*, 515 A.2d 899, 901 (Pa. 1986) (quoting R. Branning, PENNSYLVANIA CONSTITUTIONAL DEVELOPMENT 37 (1960)); *see Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 877 A.2d 383, 394 (Pa. 2005) (agreeing with the above, and noting that the resultant mandates limiting legislative power "retain their value even today by placing certain constitutional limitations on the legislative process").

system, making schools "an integral part of our governmental system, as a state institution," and rendering school districts "but agencies of the state Legislature to administer [its newly-defined] constitutional duty." *Wilson v. Sch. Dist. of Phila.*, 195 A. 90, 94-95 (Pa. 1937); *see Bd. of Pub. Educ. of First Sch. Dist. v. Ransley*, 58 A. 122, 123 (Pa. 1904) ("A review of constitutional provisions and legislative enactments clearly shows that the state has regarded the education of its children as one of its duties and functions . . . .").

While the procedural posture of this case militates against delving deeply into the history of—or drawing broad conclusions regarding the collective intent underlying—the phrase "thorough and efficient," some contemporaneous context nonetheless is illuminating. Most notably, delegates to the convention appear to have linked the importance of public education to the success of democracy, with William Darlington averring that "the perpetuity of free institutions rests, in a large degree, upon the intelligence of the people, and that intelligence is to be secured by education," and further opining that "[t]he section on education is second in importance to no other section to be submitted to this Convention." *PARSS* at 98 (quoting II PENNSYLVANIA DEBATES OF 1873 421).[14] This Court, in turn, has noted that the General Assembly, while enacting piecemeal legislation in its service, did not entirely fulfill the 1790 Constitution's education mandate until the Act of May 8, 1854, P.L. 617, which for the

---

[14] The transition from a mandate to "establish" a system of education to one requiring "maintenance and support" was described by one delegate to the 1873 convention as a way of recognizing "the existence of that admirable system of public schools which now prevails all over the Commonwealth," *i.e.*, as a reflection of principle and the *status quo*, rather than a mandate to effect specific change. Dinan, *supra* n.11, at 942 (2007) (quoting 2 PENNSYLVANIA CONVENTION OF 1872-73 419-20).

first time "established a system of common school education for all the counties of the [C]ommonwealth." *Ransley*, 58 A. at 123.

Reflecting a general preference for the protection of local school district prerogatives over state control that persists to this day in Pennsylvania and throughout the country, the Convention rejected a proposal to add the word "uniform" in the Education Clause ahead of the words "thorough" and "efficient." Opponents of uniformity expressed, *inter alia*, concerns that the word would deny schools the ability to tailor their instruction to the disparate needs of children in urban and rural districts, with one conventioneer cautioning against the imposition of statewide curricular requirements. Concerns also arose that local districts would be precluded from raising additional funds to supplement and enrich the educations they might provide, a disfavored intrusion upon local prerogatives. *See Danson v. Casey*, 399 A.2d 360, 366-67 (Pa. 1979) (noting that the framers of the 1874 Constitution considered and rejected adding a uniformity requirement to the Education Clause, thereby "endors[ing] the concept of local control to meet diverse local needs"). The risk of a race to the bottom also was considered, based upon the fear that, far from elevating school districts with lower standards, a uniformity requirement would cause higher-flying schools to weaken their efforts.

A spirited debate also arose regarding the proposed $1 million funding mandate.[15] Supporters argued that such funds would prevent the "farcical" situation whereunder some local taxing jurisdictions, in order to finance a school year of state-

---

[15] While it may seem strange now, this Court once described this as a "magnificent sum." *Ford v. Sch.-Dist. of Kendall Borough*, 121 Pa. 543, 547 (Pa. 1888).

specified duration, would be forced to impose an onerous millage rate upon their residents, while other districts would be able to impose a less burdensome funding structure on their own constituents. Instead, the appropriation "would equalize the burdens of supporting the system" of education prescribed by the Constitution. *PARSS* at 101 (quoting II PENNSYLVANIA DEBATES OF 1873 679).[16] Conversely, opponents raised the specter of state intrusion upon local districts' prerogatives to tailor education to local resources and needs.

The 1874 numbering and text of the Education Clause were amended during the 1967 constitutional convention to read, "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." PA. CONST. art. III, § 14. Once again, uniformity was absent from the text. The $1 million appropriation requirement was omitted as anachronistic. Thus, while the language upon which the instant case primarily hinges first appeared in our Constitution in 1874, it did not take on its present form until the adoption of the 1968 Constitution.

## B. The Parties and the Action

Appellant-Petitioners include public school districts spanning the Commonwealth, from Philadelphia and Delaware Counties in southeastern Pennsylvania to Cambria County in the west. Petitioners also include students and parents and guardians of students who attend the named school districts and others. They further include the

---

[16] Interestingly, according to Petitioners' allegations as related *infra*, that concern remains emergent, as low-wealth districts continue to assess taxes upon property in their domains at a much higher rate than those of wealthier districts, while the former still collect significantly less school tax revenue per student than the latter.

Pennsylvania Association of Rural and Small Schools ("PARSS"), a statewide membership organization that comprises approximately 150 school districts and provides advocacy and training to address problems that affect rural school districts, and the NAACP—Pennsylvania State Conference, a Commonwealth affiliate of the National Association for the Advancement of Colored People.

As set forth at length below, Petitioners filed a Petition for Review in the Commonwealth Court's original jurisdiction, naming as Respondents the President *Pro Tempore* of the Pennsylvania Senate, Joseph B. Scarnati, III, and the then-Speaker of the Pennsylvania House of Representatives, Samuel H. Smith (collectively, "Legislative Respondents"); and the Pennsylvania Department of Education, Secretary of Education Pedro Rivera, and Governor Tom Wolf (collectively, "Executive Respondents"). Petitioners sought declaratory and injunctive relief aimed at rectifying what they alleged are constitutional deficiencies in Pennsylvania's system of public education arising from the General Assembly's failure to support and maintain the thorough and efficient system of education mandated by the Pennsylvania Constitution.

### C. Petitioners' Allegations

Petitioners' averments, which for purposes of review we must take as true and read in the light most favorable to their causes of action,[17] fall into two sometimes overlapping categories. Generally, Petitioners aver that Pennsylvania's school funding system is flawed on its face in its failure to ensure, in tandem with local funding, that each school district has the resources necessary to provide an adequate education. This includes broad averments as well as more particularized allegations, couched in

---

[17]    *Kuren v. Luzerne Cnty.*, 146 A.3d 715, 718 n.1 (Pa. 2016).

quantitative comparisons of various districts' resources and respective capacities to provide an education of a quality that satisfies the Education Clause's mandate. Specifically, Petitioners plead numerous allegations concerning the circumstances faced by their own districts, as well as the alleged injuries that a constitutionally inadequate school system has caused the individual petitioners, children attending such schools and their parents or guardians. As an organizing principle, we review these allegations in turn.

In 1999, the General Assembly imposed an elaborate set of standards to govern the content of educational materials, which led to the adoption of assessment and accountability measures tied to those standards. Thus, through authority conferred by the School Code, the Department of Education adopted a series of regulations "to establish rigorous academic standards and assessments, applicable only to the public schools in this Commonwealth, to facilitate the improvement of student achievement and to provide parents and communities a measure by which school performance can be determined." 22 Pa. Code § 4.2.[18]

---

[18] One commentator, addressing the evolution of the "standards-based model" of education, provides a useful shorthand for the components of such an educational paradigm, noting that the model entails "three key components: (1) academic content standards for various subjects identifying what a student should know and be able to do at each grade level; (2) standardized tests designed to gauge student mastery of these standards; and (3) a system of accountability for schools, including rewards and consequences based on individual school and district performance." Jill Ambrose, *Note, A Fourth Wave of Education Funding Litigation: How Education Standards & Costing-Out Studies Can Aid Plaintiffs in Pennsylvania & Beyond*, 19 B.U. PUB. INT. L.J. 107, 117 (2009).

Executive Respondents reject the thrust of Petitioners' contention that 1999 marked the initial imposition of academic standards upon school districts. Executive Respondents note that, over fifty years ago, in 1963, in service of the goal of facilitating the "expeditious reorganization" of the Commonwealth's public school system, (continued…)

In its statement of "general policies," the new regulatory framework reinforced the principle that districts should be free to fashion local curricula to achieve prescribed academic standards, retaining "the greatest possible flexibility in curriculum planning," while meeting prescribed course and curriculum requirements, ensuring the provision of specified numbers of days and hours of instruction at different school levels, and maintaining a sufficient professional staff. The Department further committed to support local efforts, by, *e.g.*, establishing model curricula and diagnostic tools tailored to satisfying the state assessment system. 22 Pa. Code. § 4.4. The state assessments

---

(…continued)
24 Pa.C.S. § 2-290, the General Assembly directed the Department of Education to "develop or cause to be developed an evaluation procedure designed to measure objectively the adequacy and efficiency of the educational programs offered by the public schools" by, *e.g.*, deploying tests to measure "the achievements and performance of students." 24 P.S. § 2-290.1; *see* Brief for Executive Respondents at 23. They note that systematic school and student assessments were administered as early as the 1969-70 school year under the Educational Quality Assurance ("EQA") program, which was joined, in 1984, by the Testing for Educational Learning and Literacy Skills ("TELLS"). EQA was discontinued in 1988, and, in 1992, TELLS was replaced by the first incarnation of the Pennsylvania System of School Assessment ("PSSA"). This does not strike us as contradictory of Petitioners' claim that the pervasiveness, rigor, and thoroughness of the tests employed by the Commonwealth in determining the progress of individual students and the success of individual teachers, programs, and schools and their districts increased significantly in 1999, when, by Executive Respondents' own admission, the PSSA was substantially overhauled. *Id.* at 26-27. Passage of the No Child Left Behind Act in 2001 tied federal funding to various federal mandates and standards. *See* 20 U.S.C. § 6311; Aaron Y. Tang, *Broken Systems, Broken Duties: A New Theory for School Finance Litigation*, 94 Marq. L. Rev. 1195, 1213-14 (2011). In light of the complications associated with this subject, our standard of review prevails and we assume the truth of Petitioners' averments in this regard. But to the extent that it is material to what follows, we accept as undisputed Executive Respondents' observation that standards and measurement have been in play in Pennsylvania public education in one form or another since the 1960s, and that these continue to evolve. That being said, Respondents do not suggest that there is a strong resemblance between the pre-1999 and post-1999 landscape in terms of the frequency, depth, and consequence associated with the exams administered to students who attend Pennsylvania's public schools. Absent that, we are bound to accept the thrust of Petitioners' assertions as true to at least that extent.

are conducted primarily through the Pennsylvania System of School Assessment ("PSSA") and Keystone Exams. *See generally* 22 Pa. Code. §§ 4.51, *et seq.*

In 2008, the General Assembly passed Act 61.[19] In that measure, the legislature responded to an extensive "costing out" study it had commissioned, which had established benchmarks for effective funding levels on a district-by-district basis and pointed to widespread funding deficiencies and inequities in Pennsylvania's public school system.[20] The General Assembly implemented a "Basic Education Funding Plan" for calculating the distribution of state resources among Pennsylvania's school districts. The costing-out study found that 94% of Pennsylvania school districts were spending less than should be spent to meet the Commonwealth's own academic standards. The poorest quintile of school districts needed to spend 38% more than they were spending, while the wealthiest quintile needed to increase spending by 7%. The aggregate statewide shortfall relative to what was required to meet those standards was over $20 billion. Under Act 61, funding levels for the 2008-09 school year increased by $274.7 million, a 5% increase over the preceding year. In the two years that followed, utilizing the same formula, the Commonwealth increased state funding by approximately $300 million and $355 million, respectively. Thus, as against the study's recommended

---

[19] Act of July 9, 2008, P.L. 846, No. 61, *amending* Act of Mar. 10, 1949, P.L. 30, No. 14, *codified at* 24 P.S. §§ 1-101, *et seq.*

[20] While we consider this "costing-out" study, *infra*, to the extent necessary to address the parties' arguments, it is beyond the scope of this Opinion to delve deeply into the nature of such studies. For a succinct description of the methodologies employed in such studies and how they have been utilized in forming education policy in other states, as well as a brief description of the specific study conducted at the behest of the Pennsylvania General Assembly, *see* Ambrose, *supra* n.18, at 119-22.

$20 billion increase, Act 61 provided for an increase of roughly $1 billion over three school years.

The increased funding drew heavily upon federal stimulus funds furnished to the state pursuant to the American Recovery and Reinvestment Act of 2009 ("ARRA").[21] ARRA expired in 2011, by which time the Commonwealth had relied upon hundreds of millions of federal dollars to reduce the Commonwealth's direct contribution to the funding pool by which Act 61's mandate was fulfilled. In the wake of ARRA's expiration, the Commonwealth faced a shortfall of over $800 million relative to prior funding levels, which was reflected in the 2011 budget. Pursuant thereto, the basic education subsidy was reduced by $420 million; Accountability Block Grants, which fund initiatives such as full-day kindergarten, tutoring assistance, and class size reduction, by $160 million; charter school reimbursements, which partially compensate school districts for the cost of transferring district funds to charter schools, by $224 million; and the Educational Assistance Program, which funds tutoring services, by $47 million, with additional reductions affecting other initiatives, including those aimed at improving educational achievement in low-performing schools. The 2011 budget also destabilized school funding generally, by abandoning Act 61's long-term funding formula in favor of mutable annual funding calculations. Compounding the funding shortfalls was the Taxpayer Relief Act of 2006,[22] which restricted the ability of local jurisdictions to offset state budget cuts by increasing local taxes. In 2011, Petitioners note, in the face of the above

---

[21] Act of Feb. 17, 2009, P.L. 111-5, 123 Stat. 115, *codified as amended at* 26 U.S.C. §§ 1, *et seq.*

[22] Act of June 27, 2006, P.L. 1973, No. 1 (Spec. Sess. No. 1), § 1, *codified at* 53 P.S. §§ 6926.101, *et seq.*

funding reductions, the Department of Education, pursuant to the Taxpayer Relief Act, set the relevant index at a low level such that, even given the political will, local districts simply lacked the authority to raise local taxes enough to offset fully the state funding reductions.[23]

Petitioners allege[24] that the 2011 cuts hit low-wealth districts much harder than more prosperous districts, reducing per capita expenditures by $833 in districts where more than half the students lived in low-income households in the 2011-12 school year, as compared to per capita reductions of approximately $166 in districts with student bodies comprised of 25% or fewer low-income students. Petition for Review ("Petition") at 54 ¶ 142 & n.46 (citing Pa. Budget & Policy Ctr. Staff, *Pa. House Budget Locks in Most of the School Funding Cuts*, June 21, 2013). Petitioners further allege a host of pronounced inequities within and among school districts that obtained under the 2011 funding scheme, including but not restricted to massive district-by-district funding disparities; low-wealth districts' inability to provide individualized instruction to children who require it; shortages of essential learning materials such as computers and text

---

[23]  Widespread funding shortages and reductions in education expenditures in the wake of 2008's "Great Recession" have been well-documented. *See generally* Michael A. Rebell*, Safeguarding the Right to a Sound Basic Education in Times of Fiscal Constraint*, 75 ALB. L. REV. 1855 (2011).

[24]  The considerable time that has passed since Petitioners filed their Petition necessarily renders their allegations dated, in their particulars if not in their overarching propositions. Nonetheless, as a convenience, we utilize the present tense in rendering Petitioners' allegations, with the caveat that certain specific allegations presumably will require updating as this litigation proceeds in the wake of our decision. Notably, while common sense strongly suggests that particular allegations, especially quantifiable averments, will not be accurate at any given moment relative to present circumstances, we nonetheless are bound by this case's procedural posture to accept Petitioners' allegations at face value.

books; persistent and ongoing reductions in teachers and staff, with concomitant increases in student-teacher ratios and class size; the elimination of educational programs such as art, music, and foreign languages; and deficiencies in learning materials and physical school facilities.

Petitioners offered an overview of the funding scheme that applied when they filed their Petition.[25] Their account is quite detailed, but for present purposes it suffices to highlight the broader points. Petitioners aver that 87% of Pennsylvania's public education budget is funded through state appropriations and local property taxes, while 13% is contributed by the federal government. In 2011, local taxes provided approximately 53%, with state appropriations comprising approximately 34% of statewide public school expenditures. State funds are distributed according to an aid ratio, which divides state funding according to various formulas that are designed to account for the aggregate property values and personal incomes in a given school district in discerning, speaking broadly, the wealth per student in a given district. A district's "wealth" is then measured against the state average, and the less favorably it compares, the greater proportional share of state education funds it receives.

_____

[25] When Petitioners filed their challenge, the state funding formula that applied to the allocation of state funding among school districts was provided by 24 P.S. §§ 25-2502.50 ("Basic education funding for 2010-11 school year"), 25-2502.51 (2011-12 school year), and 25-2502.52 (2012-13 school year). *See* Act of June 30, 2011, P.L. 112, No. 24, § 26. However, after the Commonwealth Court sustained Respondents' preliminary objections in this matter, and indeed after briefing was completed before this Court, the General Assembly enacted Act 35, which created a new state funding formula that applied to the 2016-17 school year and applies each year thereafter. *See* Act of June 1, 2016, P.L. 252, No. 35, § 1, *codified at* 24 P.S. § 25-2502.53. The effect of this change is addressed *infra*, at the outset of our discussion of the legal issues presented.

Districts with lower wealth per student values are unable to raise the same per capita funding through local property taxes as districts with higher values. The dependence of local tax revenues on the application of millage rates, which can vary over only a limited range, upon the aggregate value of the property in the district confers an insuperable advantage to districts that have a ratio of assessed property wealth per student that is significantly higher than districts with less aggregate property value. Thus, even low-wealth districts that impose substantially higher tax rates on their property cannot generate close to as much tax revenue per student as districts with substantially higher property values, even when the latter districts impose tax rates that are a fraction of those imposed by low-wealth districts. Thus, while Shenandoah Valley School District applied a property tax rate of 26.8 equalized mills, its local tax collections were only $4,011.48 per student. Conversely, Lower Merion School District, at 14.7 equalized mills, collected over $23,000 per student. Tredyffrin / Easttown School District, which applied a millage rate substantially less than half that applied by Shenandoah Valley, collected $19,418.38 per student, well over four times Shenandoah Valley's per-student revenue. Petitioners document numerous similar disparities between wealthy and low-wealth districts across the Commonwealth.

Turning to Petitioners' more specific allegations, the School District of Lancaster has eliminated 100 teaching positions and more than twenty administrative positions, substantially increasing the student-teacher ratio throughout the district. Where Lancaster once employed twenty librarians, it now employs five. In 2011 and 2012, Lancaster imposed a hiring and salary freeze for teachers and other staff. Panther Valley School District has struggled similarly since 2011. The number of elementary

school and high school teachers has been reduced by 10%. All district librarian positions were eliminated, as were all elementary school technology coach positions. Reductions also have adversely affected Panther Valley's ability to support its growing population of English language-learning students. Greater Johnstown School District, where an unusually high proportion of students have incarcerated, substance-abusing, and/or mentally ill family members, also has labored under the burden of reduced funding. It has eliminated twenty-five teacher positions, and has an insufficient number of administrators, counselors, and librarians, with two librarians serving four schools, resulting in cutbacks to its reading intervention program. The William Penn School District has eliminated fifty-seven teachers, five administrators, and twelve support staff. None of its schools employs a full-time guidance counselor, it has eliminated one librarian position, and in 2011 it eliminated all of its reading specialist positions. Due to severe staff reductions, William Penn's former seven-period schedule has been reduced to six periods.[26]

---

[26] The story is much the same in the Wilkes-Barre Area and Shenandoah Valley School Districts. And since 2011, *amicus curiae* Philadelphia School District has reduced the number of principals and assistant principals by 40%; teachers by 33%; special education teachers by 22%; career and technical education teachers by 37%; and counselors, student advisors, and social service liaisons by 54%. Philadelphia operates 214 schools serving approximately 131,000 students, but employs only sixty-six music teachers and three full-time-equivalent librarians. The superintendent of the Philadelphia School District, as well as Respondent Department of Education have characterized the state of public education in Philadelphia as "insufficient and unsustainable." Petition at 82-83 ¶ 200; *see id.* at 83 ¶ 201 (quoting at length a joint filing of the Philadelphia School District, the School Reform Commission, and the Department of Education in other litigation describing the "bare-bones" and "unsatisfactory" conditions and "woefully inadequate" staffing levels in the Philadelphia School District).

Petitioners further detail reductions in Petitioner School Districts of various educational programs, including art, physical education, and health education, which, Petitioners argue, are important to preparing students for "civic, economic, and social success." *Id.* at 85-86 ¶ 204. Schools also have reduced or eliminated vocational programs, interventions for struggling and at-risk students, English language-learning assistance, and programming for gifted students, including advanced placement courses. Lancaster has cut summer tutoring programs to non-high school students and nearly all foreign language education. Only half of students have access to shop and computer classes. Panther Valley has made similarly dramatic cuts, and also eliminated driver's education and SAT preparation. Greater Johnstown has been forced to reduce severely its intervention, remediation, and special education services. Similar reductions have been required in the Wilkes-Barre Area and William Penn School Districts. These cuts, they allege, have been forced primarily upon economically disadvantaged districts, while more prosperous districts have remained largely unscathed.

Petitioners also identify severe shortages in classroom materials and equipment, as well as deteriorating schools. In the School District of Lancaster, for example, Petitioners allege that much of the furniture is in need of repair or replacement, projectors are non-functioning, and textbooks and computers are severely out of date. The roof over Panther Valley's overcrowded elementary school is in need of repair, and as a temporary measure to address a shortage of usable space, the district has placed children in twelve modular classrooms. In Greater Johnstown, the roof over the middle school's auditorium is collapsing, plaster is falling from crumbling walls and ceilings, and

some bathrooms are in such disrepair that they cannot be used. Much of the technology in the Wilkes-Barre Area School District is ten or more years old, and that district's physical facilities, too, are in poor condition. In the William Penn School District, textbooks are so out of date that they do not match Pennsylvania state curricular requirements, and high school students may not bring some texts home—should they be lost, the school will not be able to replace them. In twenty-three of thirty-two school buildings in Philadelphia surveyed by Philadelphia in partnership with the Health and Welfare Fund and the federal Institute for Occupational Safety and Health, investigators found dampness, mold, or water damage in more than a third of the rooms.

By way of contrast, in the Lower Merion School District, all kindergartners and first-graders have access to iPads, and all high school freshmen are issued laptops to use as their own during their high school years.

Perhaps most importantly, Petitioners allege that certain programs and services that disadvantaged districts have been forced to reduce or eliminate are essential to equip students to meet the proficiency standards imposed by the General Assembly. Teacher layoffs and concomitant class size increases; reductions in advanced studies and programs such as art and music, as well as after-school and summer school programs for supplemental instruction; the elimination or reduction of teacher education and development relative to the areas tested; reductions in preschool and early childhood programs; out-of-date instructional materials; and the various other deficiencies enumerated above all work to prevent disadvantaged school districts from meeting the educational standards imposed by the state.

Based on the foregoing allegations, Petitioners' Petition sets forth two counts. In Count I, Petitioners assert that Respondents have violated their collective constitutional duty under the Education Clause to "provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." PA. CONST. art. III, § 14. In this regard, they allege that Respondents have defined the content of an adequate education—*i.e.*, one that will "serve the needs of the Commonwealth"—by promulgating academic standards assessed by the PSSA and Keystone exams.[27] Petitioners aver that Respondents failed to provide the school districts in question with enough funding to ensure that all students have an opportunity to receive an adequate education—where funding is measured by the allocations suggested by the General Assembly-commissioned costing-out study, and adequacy is tested by whether the students are prepared to "meet state academic standards" and to achieve "civic, economic, and social success" beyond school. *Id.* at 118 ¶ 304. Petitioners maintain that the current levels and allocation of school funding "are irrational, arbitrary, and not reasonably calculated to ensure that all Pennsylvania schoolchildren have access to an adequate education." *Id.* at 118 ¶ 305. Consequently, Petitioners claim, the General Assembly has failed to maintain and support "a thorough and efficient system of public education."

In effect, Petitioners posit that Pennsylvania law imposes a threshold obligation to provide *all* Pennsylvania students with an "adequate" education, which they define in part by reference to the very standards imposed by the General Assembly and the Department of Education, and in part by reference to the broader goal of enabling

---

[27]     *See generally* 22 Pa.Code §§ 4.1, *et seq.*

students to "participate meaningfully in the economic, civic, and social activities of our society." That is to say, while Petitioners rely significantly upon the proposition that the very instantiation of elaborate goals and assessment tools by the General Assembly reflects a legislative effort to define an adequate education against which constitutional adequacy can be measured, they appeal distinctly to broader notions of what constitutes a constitutionally adequate education of a sort that is thorough and efficient.

In their second count, Petitioners assert that Respondents have violated equal protection principles under Article III, Section 32 of the Pennsylvania Constitution. They aver that education is a fundamental right, triggering strict scrutiny of the disadvantageous classification reflected in the disparity of educational resources at the disposal of low and high-wealth districts. Petitioners do not dispute that a constitutional school funding scheme would still enable wealthier districts to provide greater resources to their students than districts that cannot raise as much money through local taxes. But they maintain that the Constitution "imposes a duty on the Commonwealth to ensure that all students have the same basic level of educational opportunity," that is, "the same fundamental opportunity to meet academic standards and to obtain an adequate education that prepares the student for civil, economic, and social success." *Id.* at 119 ¶ 308. Petitioners contend that the state charter "prohibits the General Assembly from irrationally enacting laws that benefit a select few." *Id.* at 119 ¶ 309. Petitioners assert that many funding methodologies exist that would support the state's interest in preserving local control of public education without compromising the ability of students in low-wealth school districts to obtain an adequate education. By adopting a school funding program that discriminates against students living in such districts by denying

them an equal opportunity to obtain an adequate education, the General Assembly, according to Petitioners, has denied the disadvantaged students equal protection. *Id.* at 119-20 ¶¶ 308-311.

In connection with both counts, Petitioners seek declaratory relief consistent with their allegations regarding Respondents' respective obligations, and in particular concerning the scope of the General Assembly's mandate under the Education Clause, as well as permanent injunctive relief directing Respondents to rectify the situation accordingly. Petitioners request that the Commonwealth Court retain jurisdiction in order to ensure Respondents' compliance.

Legislative and Executive Respondents each filed preliminary objections in the nature of a demurrer. *See* Pa.R.C.P. 1028(a)(4). Respondents averred primarily that Petitioners' claims present non-justiciable political questions. They maintained that responsibility for providing a thorough and efficient system of public education is textually conferred exclusively upon the legislature and that there are no judicially manageable standards for granting relief. They reasoned that these factors require courts to abstain pursuant to the political question doctrine under *Baker*, as adopted by this Court.[28] Respondents also argued that Petitioners failed to state an equal

---

[28] The *Baker* Court set forth the following factors to guide the political question analysis:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for non[-]judicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a

(continued…)

protection claim upon which relief may be granted because they do not have a fundamental right to education entitling them to strict scrutiny of the school funding scheme, and the existing statutory scheme rationally serves the state's interest in maintaining and supporting a thorough and efficient system of public education. Finally, Respondents averred that Petitioners' causes of action were barred by sovereign immunity—to the extent they sought mandatory injunctive relief—as well as the separation of powers doctrine insofar as Petitioners asked the judicial branch to compel action by the General Assembly and to subject it to ongoing judicial supervision.[29]

### D.    The Commonwealth Court's Decision

In a unanimous, published decision, the Commonwealth Court sustained Respondents' preliminary objections and dismissed Petitioners' Petition on the grounds that, pursuant to this Court's precedent, both the Education Clause claims and the equal protection claim entail non-justiciable political questions. *See William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 114 A.3d 456, 464 & n.15 (Pa. Cmwlth. 2015) (*en banc*).

---

(…continued)
  political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217; *see Robinson Twp. v. Commonwealth*, 83 A.3d 901, 928 (Pa. 2013); *Council 13, AFSCME ex rel. Fillman v. Rendell*, 986 A.2d 63, 75 (Pa. 2009); *Sweeney v. Tucker*, 375 A.2d 698, 706 (Pa. 1977). The presence of any one *Baker* factor warrants abstention under the political question doctrine. *Baker*, 369 U.S. at 217; *Blackwell v. City of Phila.*, 684 A.2d 1068, 1071 (Pa. 1996); *Zemprelli v. Daniels*, 436 A.2d 1165, 1169 (Pa. 1981).

[29]    The Commonwealth Court did not rule upon these preliminary objections, which are independent of the justiciability argument upon which the Commonwealth Court relied in sustaining Respondents' preliminary objections. Accordingly, we do not address them herein. These arguments remain salient upon remand, and our decision is not intended to prejudice Respondents' right to pursue them further in the court below.

Initially, the Commonwealth Court observed that this Court has relied upon the *Baker* considerations to ascertain whether the political question doctrine counsels in favor of abstention in a given case. *See id.* at 462 (citing *Robinson Twp. v. Commonwealth*, 83 A.3d 901, 928 (Pa. 2013), and *Sweeney v. Tucker*, 375 A.2d 698 (Pa. 1977)). Rather than analyze the *Baker* factors anew, however, the Commonwealth Court found that the question of justiciability was controlled by this Court's decision in *Marrero v. Commonwealth*, 739 A.2d 110 (Pa. 1999) ("*Marrero II*"), which relied primarily upon *Danson v. Casey*, 399 A.2d 360 (Pa. 1979). As read by the Commonwealth Court, in *Marrero II*, this Court held that the Education Clause did not confer upon students an individual right to an education of any particular quality. Rather, it imposed an exclusive mandate upon the General Assembly to provide for the aforesaid maintenance and support of a thorough and efficient system of public education. The Court further maintained that the Education Clause precluded the General Assembly from establishing any educational policy that future legislatures cannot change. "[T]he very essence" of the Education Clause, it held, "is to enable successive legislatures to adopt a changing program to keep abreast of educational advances." *William Penn Sch. Dist.*, 114 A.3d at 462 (quoting *Marrero II*, 739 A.2d at 112). Consequently, it would be equally violative of the Education Clause's "essence" for the Court to establish any fixed standard by which to measure thoroughness and efficiency. The *Marrero II* Court thus concluded that "the only judicially manageable standard this [C]ourt could adopt would be the rigid rule that each pupil must receive the same dollar expenditures," and, because expenditures per pupil "are not the exclusive yardstick of educational quality, or even constitutional quantity,"

such a standard would offend the historical means and intended ends of the Education Clause. *William Penn Sch. Dist.*, 114 A.3d at 463 (quoting *Marrero II*, 739 A.2d at 113). Thus, any legislative scheme with "a reasonable relation" to providing "for the maintenance and support of a thorough and efficient system of public schools" passes constitutional muster. *Id.* (quoting *Marrero II*, 739 A.2d at 113).

The Commonwealth Court rejected Petitioners' attempt to distinguish *Danson* and *Marrero II* on the basis that subsequently-adopted education standards and assessments, viewed in tandem with the findings of the legislatively-commissioned costing-out study, have revealed a judicially discoverable and manageable standard by which to measure constitutional adequacy. Such considerations, the Commonwealth Court held, might establish salutary policy-related benchmarks, but they cannot supply a judicially manageable standard enabling a court to determine whether the Legislature has fulfilled its constitutional duties without overstepping its bounds. *See id.* Thus, as in *Marrero II*, that want of judicially manageable standards rendered Petitioners' claims non-justiciable.[30]

This appeal followed. This Court has exclusive jurisdiction over Petitioners' appeal. *See* 42 Pa.C.S. § 723(a) ("The Supreme Court shall have exclusive jurisdiction of appeals from final orders of the Commonwealth Court entered in any matter which was originally commenced in the Commonwealth Court.").

## II. Issues Presented and Standards of Review

Petitioners frame their issues for review as follows:

---

[30]     The Commonwealth Court did not treat Petitioners' Education Clause and equal protection claims discretely, an approach which, as set forth *infra*, more or less follows from the court's reliance upon *Danson* and *Marrero II*.

## A.     Education Clause Claims

Where a petition alleges that the legislature's school[-]funding scheme bears no relationship to the actual cost of preparing students to meet state academic standards, does the political[ ]question doctrine bar the judiciary from considering whether the legislature has complied with its constitutional duty to support a thorough and efficient system of public education?

## B.     Equal Protection

Where a petition alleges gross and irrational disparities in school funding between low-wealth and high-wealth school districts, does the political question doctrine preclude students in low-wealth school districts from asserting an equal protection claim to protect their individual constitutional rights?

Brief for Petitioners at 2.[31]

We exercise *de novo* review of a lower tribunal's order sustaining preliminary objections in the nature of a demurrer. *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 56 (Pa. 2014). The scope of our review is plenary. *Kuren v. Luzerne Cnty.*, 146 A.3d 715, 753 (Pa. 2016). We must determine "whether, on the facts averred, the law says with certainty that no recovery is possible." *Bruno*, 106 A.3d at 56. In conducting our review, "we accept as true all well-pleaded material facts set forth in the [petition for review] and all inferences fairly deducible from those facts." *Kuren*, 146 A.3d at 718 n.1. We will sustain preliminary objections "only when, based on the facts pleaded, it is clear and free from doubt that the complainant will be unable to prove facts legally

---

[31]     The City of Philadelphia, as well as several individuals and organizations, have filed *amicus* briefs supporting Petitioners' position, including the Philadelphia Federation of Teachers, Local 3, of the American Federation of Teachers, together with the American Federation of Teachers Pennsylvania, AFT; two groups of youth, education, and civil rights advocacy associations led, respectively, by Public Citizens for Children and Youth and the Consortium for Public Education; and a group of individual professors of constitutional law.

sufficient to establish a right to relief." *Id.* (quoting *Mazur v. Trinity Area Sch. Dist.*, 961 A.2d 96, 101 (Pa. 2008)).

## III. Discussion

### A.    Mootness and Appealability

As noted, *supra* n.25, with the enactment of 72 P.S. § 25-2502.53 and related provisions (hereinafter, "Act 35") during the pendency of this appeal, the General Assembly supplanted the funding formula that applied when Petitioners filed suit.  This new enactment is the subject of a Supplemental Brief submitted by Governor Tom Wolf,[32] to which Petitioners responded in turn.  Governor Wolf submits that Act 35 for the first time bases allocations on the "objective needs of each district."  Supplemental Brief of Governor Tom Wolf at 3.  Governor Wolf contends that these salutary changes militate in favor of affirmance, but does not argue that the changes moot Petitioners' claims.[33]  The question presented concerns the justiciability of Petitioners' claims.  The nature of the applicable state formula (which can change any time the legislature chooses) goes to the correct ruling only if the claims are justiciable in the first instance.

---

[32]    We granted Governor Wolf leave to file his brief by *per curiam* Order of September 22, 2016, shortly after we heard oral argument in this matter.

[33]    We have described the mootness doctrine as follows:

> [C]ases presenting mootness problems involve litigants who clearly had standing to sue at the outset of the litigation.  The problems arise from events occurring after the lawsuit has gotten under way—changes in the facts or in the law—which allegedly deprive the litigant of the necessary stake in the outcome.  The mootness doctrine requires that an actual case or controversy must be extant at all stages of review, not merely at the time the complaint is filed.

*Pub. Def.'s Office of Venango Cnty. v. Venango Cnty. Court of Common Pleas*, 893 A.2d 1275, 1279 (Pa. 2006) (quoting *Pap's A.M. v. City of Erie*, 812 A.2d 591, 599-600 (Pa. 2002)).

Changes in the formula do not render the questions presented moot, nor do they materially affect the substance of our ruling in the case's present posture.[34]

## B.  Justiciability and the Political Question Doctrine

The cornerstone of our republican democracy is the principle of government divided into three separate, co-equal branches that both empower and constrain one another. *See Robinson Twp.*, 83 A.3d at 927 n.16.  Judicial review stands as a bulwark against unconstitutional or otherwise illegal actions by the two political branches.  "It is emphatically the province and duty of the judicial department," instructed Chief Justice John Marshall, "to say what the law is."  *Marbury v. Madison*, 5 U.S. 137, 177 (1803).  The foundation for the rule of law as we have come to know it is the axiom that, when disagreements arise, the Court has the final word regarding the Constitution's meaning.

Even as the separation of powers upon which our system depends relies substantially upon judicial review, the courts long have recognized that the very same imperatives sometimes require judicial abstention.  In *Marbury* itself, the Court contemplated the prospect that certain legal acts and omissions may be neither

---

[34]    Even if we were to find that the particular claims presented technically were mooted by the passage of Act 35, Petitioners would have a compelling argument for this Court to proceed to decision on the basis that the issues as stated are of importance to the public interest and "capable of repetition yet evading review."  *See Commonwealth, Dep't of Env'l Protection v. Cromwell Twp., Huntingdon Cnty.*, 32 A.3d 639, 652 (Pa. 2011).  At the inception of any action such as the one presented—the public importance of which cannot be disputed—there inheres the risk that the General Assembly will move the goalposts by enacting new legislation, a risk that was especially true under the legislation that applied when Petitioners filed their appeal, when the General Assembly had transitioned to an annual funding process from one applying a formulaic approach indefinitely or over a designated series of years.  In any event, this Court is not asked at this juncture to decide the constitutionality of a particular funding formula, but rather whether a claim regarding the constitutionality of *any* funding formula may be litigated or instead lies entirely outside judicial review.

assessed nor corrected by judicial intervention. *Id.* at 164 ("That there may be such cases is not to be questioned . . . ."). As Chief Justice Marshall allowed, and as the centuries have proven, judicial review has its limitations, including those suggested by what has come to be known as the political question doctrine.

The parameters of the political question doctrine have never been amenable to precise definition. In 1955, Justice Felix Frankfurter acknowledged the difficulty that attends any effort to delineate the scope and application of the doctrine:

> I . . . believe that no judge charged with the duty of enforcing the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Equal Protection of the Laws Clause of the Fourteenth Amendment, can free himself from the disquietude that the line is often very thin between the cases in which the Court felt compelled to abstain from adjudication because of their "political" nature, and the cases that so frequently arise in applying the concepts of "liberty" and "equality."

Felix Frankfurter, *John Marshall and the Judicial Function*, 69 HARV. L. REV. 217, 227 (1955).

Not long after Justice Frankfurter expressed his misgivings, the United States Supreme Court, confronted with a challenge to state-level efforts to fashion congressional districts, distilled the following six-factor test from its prior political question decisions:

> [S]everal formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the

potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217.

*Baker* has not appreciably mitigated the difficulty of locating Justice Frankfurter's "very thin" line. The *Baker* Court itself acknowledged that its discussion "require[d] review of a number of political question cases, in order to expose the attributes of the doctrine—attributes which, in various settings, diverge, combine, appear, and disappear in seeming disorderliness." *Id.* at 210. The Court also made the following observation:

> Much confusion results from the capacity of the 'political question' label to obscure the need for case-by-case inquiry. Deciding whether a matter has in any measure been committed by the Constitution to another branch of government . . . is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.

*Id.* at 210-11; *accord Nixon v. United States*, 506 U.S. 224, 228 (1993); *Powell v. McCormack*, 395 U.S. 486, 521 (1969). "[D]eference," the Court said, "rests on reason, not habit." *Baker*, 369 U.S. at 213.[35]

Although Pennsylvania has employed the *Baker* factors in its own political question jurisprudence, we mine the doctrine from a different seam. We have held that, "[i]n contrast to the federal approach, notions of case or controversy and justiciability have no constitutional predicate, do not involve a court's jurisdiction, and are regarded

---

[35] Scholars have questioned the very existence of a discrete political question doctrine. *See* Louis Henkin, *Is There a "Political Question" Doctrine?*, 85 YALE L.J. 597, 605 (1976) ("[T]he considerations distilled from [earlier cases] by Justice Brennan [in *Baker*] seem rather to be elements of the ordinary respect which the courts show to the substantive decisions of the political branches."); *id.* at 606 ("In such cases . . . the court does not refuse judicial review; it exercises it. It is not dismissing an issue as non-justiciable; it adjudicates. It is not refusing to pass upon the power of the political branches; it passes upon it, only to affirm that they had the power which had been challenged and that nothing in the Constitution prohibited the particular exercise of it.").

instead as prudential concerns implicating courts' self-imposed limitations." *Robinson Twp.*, 83 A.3d at 917;[36] *see Zemprelli v. Daniels*, 436 A.2d 1165, 1169 (Pa. 1981) (quoting Laurence Tribe, AMERICAN CONSTITUTIONAL LAW 79 (1978)) ("Thus the political question doctrine, like other justiciability doctrines, at bottom reflects the mixture of constitutional interpretation and judicial discretion which is an inevitable by-product of the efforts of federal courts to define their own limitations."); *cf. Nixon*, 506 U.S. at 252-53 (Souter, J., concurring) ("[T]he political question doctrine is essentially a function of the separation of powers, . . . deriving in large part from prudential concerns about the respect [the judiciary] owes the political departments.  Not all interference is inappropriate or disrespectful, however, and application of the doctrine ultimately turns, as Learned Hand put it, on 'how importunately the occasion demands an answer.'" (citations and some internal quotation marks and modifications omitted)).

In *Robinson Township*, Chief Justice Castille synthesized our political question jurisprudence as follows:

> The judicial power of the Commonwealth is not vested in the General Assembly, but in a unified judicial system, which includes the Commonwealth Court and, ultimately, this Court, which presides over our branch of government.  *See* PA. CONST. art. V, § 1.
>
> In application, the Court has recognized that "[i]t is the province of the Judiciary to determine whether the Constitution or laws of the Commonwealth require or prohibit the performance of certain acts.  That our role may not extend to the ultimate carrying out of those acts does not reflect upon our capacity to determine the requirements of the law." *Council 13, AFSCME ex rel. Fillman v. Rendell,* 986 A.2d 63, 75 (Pa. 2009) (quoting *Thornburgh v. Lewis,* 470 A.2d 952, 955 (Pa. 1983)).  This is not a radical proposition in American law.  *See, e.g., Marbury*,

---

[36]    Although the lead opinion in *Robinson Township* did not command a majority of the Court in all particulars, a majority of Justices joined this account of the political question doctrine.

5 U.S. at 166 ("[W]here a specific duty is assigned by law [to another branch of government], and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy."). Indeed, "[o]rdinarily, the exercise of the judiciary's power to review the constitutionality of legislative action does not offend the principle of separation of powers," and abstention under the political[ ]question doctrine is implicated in limited settings. *See Hosp. & Healthsys. Ass'n of Pa. v. Commonwealth,* 77 A.3d 587, 596 (Pa. 2013) ("*HHAP*") (quoting *Sweeney,* 375 A.2d at 705).

The applicable standards to determine whether a claim warrants the exercise of judicial abstention or restraint under the political question doctrine are well[-]settled. Courts will refrain from resolving a dispute and reviewing the actions of another branch only where "the determination whether the action taken is within the power granted by the Constitution has been entrusted exclusively and finally to the political branches of government for 'self-monitoring.'" *Sweeney,* 375 A.2d at 706; *Council 13,* 986 A.2d at 76. To illustrate our approach to the political question doctrine, we customarily reference the several formulations by which the U.S. Supreme Court has described a "political question" in *Baker* . . . . *See, e.g., Council 13; Thornburgh,* supra.

* * * *

We have made clear, however, that "[w]e will not refrain from resolving a dispute which involves only an interpretation of the laws of the Commonwealth, for the resolution of such disputes is our constitutional duty." *Council 13,* 986 A.2d at 76 (quoting *Thornburgh,* 470 A.2d at 956). "[T]he need for courts to fulfill their role of enforcing constitutional limitations is particularly acute where the interests or entitlements of individual citizens are at stake." *HHAP,* 77 A.3d at 597 (citing *Sweeney,* 375 A.2d at 709 ("[T]he political question doctrine is disfavored when a claim is made that individual liberties have been infringed.")); *accord Gondelman v. Commonwealth,* 554 A.2d 896, 899 (Pa. 1989) ("Any concern for a functional separation of powers is, of course, overshadowed if the [statute] impinges upon the exercise of a fundamental right . . . ."). . . . Responsive litigation rhetoric raising the specter of judicial interference with legislative policy does not remove a legitimate legal claim from the Court's consideration; the political question doctrine is a shield and not a sword to deflect judicial review. *Council 13,* 986 A.2d at 75-76. Furthermore, a statute is not exempt from a challenge brought for judicial consideration simply because it is said to be the General Assembly's expression of policy rendered in a polarized political context. *See id.* at 76; *HHAP,* 77 A.3d at 598 ("[The] political question doctrine does not exist to remove a question of law from the Judiciary's purview merely because another branch has stated its own opinion of the salient

legal issue."). Whatever the context may have been, it produced legislation; and it is the legislation that is being challenged. As the U.S. Supreme Court has stated:

> The idea that any legislature . . . can conclusively determine for the people and for the courts that what it enacts in the form of law, or what it authorizes its agents to do, is consistent with the fundamental law, is in opposition to the theory of our institutions. The duty rests upon all courts . . . when their jurisdiction is properly invoked, to see to it that no right secured by the supreme law of the land is impaired or destroyed by legislation. This function and duty of the judiciary distinguishes the American system from all other systems of government. The perpetuity of our institutions, and the liberty which is enjoyed under them, depend, in no small degree, upon the power given the judiciary to declare null and void all legislation that is clearly repugnant to the supreme law of the land.

*Smyth,* 169 U.S. at 527-28.

*Robinson Twp.*, 83 A.3d at 927-29 (citations modified; footnote omitted); *see HHAP*, 77 A.3d at 596-98 (quoting *Jubelirer v. Singel*, 638 A.2d 352, 358 (Pa. Cmwlth. 1994)) ("[Where petitioners allege various constitutional violations] we will not abdicate our responsibility to '[e]nsure that government functions within the bounds of constitutional prescription . . . under the guise of deference to a co-equal branch of government. . . . [I]t would be a serious dereliction on our part to deliberately ignore a clear constitutional violation.'"). While this Court has commented that the presence of any one *Baker* criterion will render the question non-justiciable, *Zemprelli*, 436 A.2d at 1169, we have been circumspect in our application of the political question doctrine—arguably more so recently. *See* Law Professors' *Amicus Curiae* Brief at 18-19 & n.17 (counterposing six cases since 2000 in which this Court rejected political question doctrine arguments against two in which we did, one of which relied upon *Marrero II*).

A critical aspect of this formulation, arguably absent from *Baker* and its federal progeny, warrants special notice. Under our account of the textual commitment factor,

we will abstain from reviewing cases only where "the determination whether the action taken is within the power granted by the Constitution *has been entrusted exclusively and finally to the political branches of government for 'self-monitoring.'*" *Sweeney*, 375 A.2d at 706 (emphasis added); *cf. Nixon,* 506 U.S. at 240 (White, J., concurring) ("[T]he issue in the political question doctrine is *not* whether the constitutional text commits exclusive responsibility for a particular governmental function to one of the political branches. . . . Rather, the issue is whether the Constitution has given one of the political branches final responsibility for interpreting the scope and nature of such a power." (emphasis in original)).[37]  It will not suffice to prevent our review to observe that the constitutional provision in question has directed the General Assembly, not the courts, to "provide for a thorough and efficient system of public education."  The question is whether our Constitution, explicitly or impliedly, can be read as reflecting the clear intent to entrust the legislature with the sole prerogative to assess the adequacy of its own effort to satisfy that constitutional mandate.  If the Constitution confers upon the General Assembly the exclusive authority to monitor its own compliance with the Education Clause, that authority's absence from the text of the Education Clause requires that it must be inferred.

### C. The *Teachers' Tenure Act Case*, *Danson*, and *Marrero II*

As the discussion above suggests, deciding the two questions presented in this case requires us to examine our ruling in *Marrero II*, which itself adopted wholesale the

---

[37]  *See* Herbert Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 HARV. L. REV. 1, 7-8 (1959) ("[A]ll the [political question] doctrine can defensibly imply is that the courts are called upon to judge whether the Constitution has committed to another agency of government the *autonomous* determination of the issue raised, a finding that itself requires an interpretation.") (emphasis added).

Commonwealth Court's earlier opinion in that case, *see Marrero ex rel. Tabales v. Commonwealth*, 709 A.2d 956 (Pa. Cmwlth. 1998) (*"Marrero I"*). To do so, we must first review the precedents upon which *Marrero I* and *Marrero II* relied, beginning with the *Teachers' Tenure Act Case*, *i.e., Malone v. Hayden*, 197 A. 344 (Pa. 1938).

In the *Teachers' Tenure Act Case*, this Court confronted teachers' *mandamus* challenge to the Teachers' Tenure Act, which affected the contractual relationship between school districts and teachers subject to the Act's ambit. "In considering laws relating to the public school system," we held, "courts will not inquire into the reason, wisdom, or expedience of the legislative policy" at issue, but only "whether the legislation has a reasonable relation to the purpose expressed in [the Education Clause], and whether the fruits or effects of such legislation impinge on the article by circumscribing it, or abridging its exercise by future Legislatures within the field of 'a thorough and efficient system of public schools.'" 197 A. at 352. Far from imposing a fixed standard upon the General Assembly, we observed, the Education Clause was designed "to enable successive Legislatures to adopt a changing program to keep abreast of educational advances. The people have directed that the cause of public education . . . must evolute or retrograde with succeeding generations as the times prescribe." *Id.* Thus, all matters bearing upon education, from employment contracts to "legislative determinations of school policy or the scope of educational activity, . . . must at all times be subject to future legislative control." *Id.* If the General Assembly does not retain such freedom, we held, "we will not have a thorough and efficient system of public schools." *Id.*

It is important to note that, in that case, this Court considered whether the Teachers' Tenure Act would preclude or interfere with future legislatures' freedom to refine and innovate education policy, thus confounding the Education Clause's inferred purpose to afford the General Assembly precisely such latitude. That is to say, we asked whether the incumbent General Assembly at the time had prospectively infringed the prerogative of successor legislatures. To the contrary, we found that the General Assembly's modification of the pre-existing teacher contracts was an exercise of the legislature's freedom to innovate and adjust education policy, noting as well that "a subsequent Legislature may abolish [the Teachers' Tenure Act,] *in toto*, if it deems it necessary to do so." *Id.* at 353.[38]

Notably, we did not specifically decline to decide the constitutional challenge as a political question. Rather, we measured the challenged legislation against the Education Clause *substantively* without any express reservation about our authority to do so. In adopting and applying the "reasonable relation" test, this Court assumed a deferential posture toward the General Assembly's efforts, reflecting the judicial restraint

---

[38] Inasmuch as this responded implicitly to the suggestion that the General Assembly might ever pass a statute concerning education that interfered with its own ability to later repeal or modify that statute, or otherwise change education policy by legislative action, it flirts with incoherence. Unlike the United States Congress, the Pennsylvania General Assembly is not limited to specifically enumerated powers. Rather, it may legislate in any way that is not expressly forbidden by the Pennsylvania or United States Constitution. *Compare* U.S. CONST. art. I, § 8 (enumerating Congressional prerogatives), *with Russ v. Commonwealth*, 60 A. 169, 172 (Pa. 1905) (quoting *Norris v. Clymer*, 2 Pa. (Barr.) 277, 285 (1845)) ("What the people have not said in the organic law their representatives shall not do, they may do. . . . 'The Constitution allows to the Legislature every power which it does not positively prohibit.'"). Thus, if the question is whether the General Assembly has authority to legislate in the education arena, the answer is "Yes" in virtually every circumstance, provided it stays within constitutional bounds.

ostensibly necessary to preserve free legislative development of education policy. However, in underscoring that any successor legislature would be free to amend or repeal the Teachers' Tenure Act, the Court spoke forcefully against the government's prerogative to "bargain[] away or fetter[]" education, and emphasized that no laws, or "legislative incursions," can be permitted to "destroy" the underlying constitutional purpose. *Id.* The Court thus implied that there was a body competent to ensure that such abuses did not happen. By its reference to "legislative incursions," the Court confounded any suggestion that the General Assembly itself could be that body. Structurally, only courts might police such legislative "incursions" upon the constitutional mandate.

Nearly a half-century later, in *Danson v. Casey*, 399 A.2d 360 (Pa. 1979), a case that defies confident interpretation, plaintiffs alleged that "Pennsylvania's system of school financing fail[ed] to provide Philadelphia's public school children with a thorough and efficient education and denie[d] them equal educational opportunity solely because of their residence in the School District of Philadelphia." *Id.* at 363. Plaintiffs sought injunctive relief based upon alleged violations of the Education Clause and equal protection principles enshrined by Article III Section 32.[39] Petitioners challenged the Commonwealth's failure to supplement the Philadelphia School District's budget so as to "furnish the children of Philadelphia . . . with a normal program of full educational services" or to ensure that "the programs of educational services . . . are substantially uniform throughout all the school districts of the state." *Id.* at 362-63.

---

[39] *See supra* n.3.

This Court first reviewed the prevailing formula by which state funds were distributed to school districts statewide, a formula that, like the current one, sought to ameliorate the hardships faced by economically disadvantaged districts. State funding notwithstanding, in fact and by design, local revenue sources remained the major source of school financing, just as they are now. *Id.* at 363-64. Notwithstanding the General Assembly's partial mitigation of the differences in resources produced by school districts' heavy reliance upon highly variable local tax policies and tax bases, plaintiffs argued that the legislative formula was insufficient to satisfy the Education Clause's mandate.

"More than forty years ago," we observed in *Danson*, the Court "recognized [in the *Teachers' Tenure Act Case*], that because educational philosophy and needs change constantly, the words 'thorough and efficient' must not be narrowly construed." *Id.* at 366. Reaffirming that the Education Clause must "enable successive legislatures to adopt a changing program to keep abreast of educational advances," *id.* (quoting the *Teachers' Tenure Act Case*, 197 A. at 352), we held that "[i]t would be . . . contrary to the 'essence' of the Constitutional provision for this Court to bind future Legislatures and school boards to a present judicial review of a constitutionally required 'normal' program of educational services." *Id.* The Court then fashioned of whole cloth the hypothesis that the only way we might "attempt to define the specific components of a 'thorough and efficient [system of] education'" in a "judicially manageable" fashion would be to impose "the rigid rule that each pupil must receive the same dollar expenditures." *Id.* We noted that the framers of the 1874 Constitution, in which the Education Clause first appeared with the requirement of thoroughness and efficiency, specifically considered

and rejected any suggestion that Pennsylvania's system of public education should be uniform, instead endorsing "local control to meet diverse local needs" and recognizing "the right of local communities to utilize local tax revenues to expand educational programs subsidized by the state." *Id.* at 366-67.[40] Thus, echoing the *Teachers'*

---

[40] The relationship of school funding and local control is often cited by defenders of hybrid school funding schemes that result in significant district-by-district disparities. Numerous courts and commentators have observed that this relationship is typically conclusory in its presentation, and disregards the limitations on local prerogatives caused by a paucity of financial resources. The school funding disparities defended by resort to local control in practice disserve that end as to many districts. To cite just one example, the Supreme Court of Arkansas has observed as follows:

> Those jurisdictions finding no equal protection violation in a system based on district wealth generally uphold the system of funding by finding a legitimate state purpose in maintaining local control. We find however, two fallacies in this reasoning. First, to alter the state financing system to provide greater equalization among districts does not in any way dictate that local control must be reduced. Second, as pointed out in *Serrano v. Priest*, 557 P.2d 929, 948 (Cal. 1976), "The notion of local control was a 'cruel illusion' for the poor districts due to limitations placed upon them by the system itself. . . . Far from being necessary to promote local fiscal choice, the present system actually deprives the less wealthy districts of the option."

*Dupree v. Alma*, 651 S.W.2d 90, 93 (Ark. 1983). Furthermore, recitations of the need for local control cannot relieve the General Assembly of its exclusive obligation under the Education Clause. Regardless of how it balances the minimal education that the Constitution requires to be provided to all students with the limitations inherent in local control and funding (and, again, to suggest that those two are inextricable is tendentious), the General Assembly alone must be held accountable, regardless of whether one perceives the cause of the actionable deficiency to exist at the local or state level. Thus, in *Smith v. School District of Upper Darby Township*, we held that "[t]he Constitution of 1874 . . . directed the Legislature to maintain a 'thorough and efficient system of public schools' . . . . The school system, or the school districts, then, are but agencies of the state Legislature to administer this constitutional duty." 130 A.2d 661, 667 (Pa. 1957) (quoting *Wilson v. Phila. Sch. Dist.*, 195 A. 90, 94 (Pa. 1937)); *see Robinson v. Cahill*, 303 A.2d 273, 294 (N.J. 1973) ("Whether the State acts directly or imposed the role upon local government, the end product must be what the constitution commands. A system of instruction in any district of the State which is not thorough and efficient falls short of the constitutional command. . . . [T]he obligation is the State's to rectify.").

*Tenure Act Case*, we held that the Education Clause is satisfied "as long as the legislative scheme for financing public education 'has a reasonable relation' to '[providing] for the maintenance and support of a thorough and efficient system of public schools.'" *Id*. Because the funding framework there at issue was neutral with respect to the Philadelphia School District and because it provided that district with "its fair share" of state subsidies, we concluded that the funding scheme was reasonably related "to maintenance and support of a system of public education" and thus did not violate the Education Clause. *Id*.

The *Danson* Court rejected plaintiffs' equal protection claims with nothing more than a brief observation that the Philadelphia School District could not be heard to complain of unequal treatment where it "arguably benefit[ed] from the operation of the school financing scheme [because] more sources of taxation [were] made available to Philadelphia than to any other category of school district." *Id.* at 367. Given the absence of reasoned analysis, *Danson* has very little if any precedential value regarding Petitioners' equal protection challenge. *See Ario v. Reliance Ins. Co.*, 980 A.2d 588, 598 (Pa. 2009) (Saylor, J., concurring) (quoting *Commonwealth v. Perry*, 798 A.2d 697, 707 (Pa. 2002) (Castille, J., concurring) ("[*Stare decisis*] only applies to issues actually raised, argued and adjudicated, and only where the decision was necessary to the determination of the case.")).

If the *Danson* Court's conclusory extension of the *Teachers' Tenure Act Case* to the question of justiciability was problematic, so, too, was the Court's interjection of a critical caveat into what first seemed to be a categorical ruling. Specifically, this Court declined entirely to foreclose the possibility that a funding disparity could lead to an

Education Clause violation. Instead, we distinguished cases from states in which the plaintiffs had presented evidence of "gross disparities in total and per child expenditures throughout the state[s]." *Danson*, 399 A.2d at 365 n.10 (citing cases from Ohio, New York, New Jersey, and California).[41] It bears noting that, as set forth *supra* at length, Petitioners have alleged that per capita funding varies by nearly a three-to-one ratio from the best-funded to worst-funded schools, and have offered a litany of serious deficits among districts relating to every aspect of the educational enterprise. The *Danson* Court identified no such allegations, but the ratio and other allegations set forth by Petitioners in the instant case stand in stark opposition to the vague claims described by the *Danson* Court. The allegations before us suggest a "gross disparity" that, if true, might sow doubt in the mind of a fact-finder regarding the thoroughness and efficiency of the education that the districts on the short end of the funding stick can hope to provide. More importantly, the *Danson* caveat creates a great deal of implied conflict between that opinion's *per se* overtone and its more fact-sensitive distinctions of cases granting relief in other jurisdictions, cases which the *Danson* Court did not criticize or disavow.

Nor does this discussion exhaust *Danson*'s internal tensions. On one hand, the *Danson* Court embraced and purported to apply the reasonable relation test from the *Teachers' Tenure Act Case* to the challenge presented. On the other, it recited the

---

[41]     *But see* Noreen O'Grady, *Comment, Toward a Thorough and Efficient Education: Resurrecting the Pennsylvania Education Clause*, 67 TEMP. L. REV. 613, 633 (1994) ("[W]hen the *Danson* [C]ourt characterized these debates as indicating that the framers understood that local communities had the right to use local tax revenues to expand educational programs subsidized by the Commonwealth, it failed to clarify that those framers also understood that the Commonwealth had a duty to make a 'good' or 'proper' education available to all children throughout Pennsylvania.") (footnotes omitted).

*Baker* factors and held that the claim was not justiciable. Complicating things still further, *Danson* also appeared to root its holding in the lack of "legal harm" or "legal injury" alleged, terminology invoking the discrete question of standing, the absence of which would render the claims non-justiciable for reasons wholly distinct from the political question doctrine. *See Danson*, 399 A.2d at 365.[42] In sum, the *Danson* Court's imprecise approach, especially viewed in tandem with the "gross disparity" qualification, undermines any effort to derive a broad principle regarding the justiciability of Education Clause and equal protection claims in the instant matter.

Then came *Marrero II*, the Education Clause case most like the one we now face, and the one upon which the Commonwealth relied in this case.[43] In that case, plaintiffs sought a declaratory judgment holding that the General Assembly had failed to satisfy the Education Clause's mandate relative to the Philadelphia School District. Plaintiffs sought an injunction directing the appropriation of additional funds for the district. The Commonwealth Court sustained the Commonwealth's preliminary objections, holding that the claims in question were based upon matters committed solely to the discretion of the General Assembly by the Education Clause and that the case was non-justiciable on the basis that "it would be impossible to resolve the claims without making an initial policy determination of a kind which is clearly of legislative, and

---

[42] *See HHAP*, 77 A.3d at 599 (reviewing the requirements for standing, including a "real and concrete" controversy, a "substantial, direct, and immediate" interest in the outcome of the litigation, and aggrievement by the complained-of actions or omissions).

[43] Hereinafter, we refer primarily to *Marrero I*, the Commonwealth Court's decision that this Court adopted without material supplementation. *See Marrero II*, 739 A.2d 110, 114 (Pa. 1999) ("The foregoing summary of the rationale of the Commonwealth Court discloses no error, but rather a conscientious adherence to precedent which forecloses the relief sought by appellants.").

not judicial, discretion." *Marrero I*, 709 A.2d at 966. The Commonwealth Court also found that the second *Baker* factor, a lack of judicially discoverable and manageable standards, precluded judicial review. *See* 709 A.2d at 966.

Following *Danson*'s dubious lead, the *Marrero I* court asserted baldly that the only judicially manageable standard for monitoring the legislature's compliance with the constitutional mandate would be to impose a rigid requirement that each student receive the benefit of equal expenditures, despite the fact that plaintiffs suggested no such thing.[44] To this premise, the Commonwealth Court responded, again without development or citation of developed authority, that expenditures alone "are not the exclusive yardstick of educational quality, or even of educational quantity." *Id.* at 964 (quoting *Danson*, 399 A.2d at 366).[45] Rather, the Court explained, the quality of education is dependent upon various factors, including the efficiency with which resources are utilized and the wisdom of particular expenditures. Thus, the Commonwealth Court ruled, "[a]s long as the legislative scheme for financing public education 'has a reasonable relation' to '[providing] for the maintenance and support of

---

[44] Notably, in his *Danson* dissent, Justice Manderino disputed the majority's similar characterization of the petitioners' claims in that case, observing that they did not "ask that this Court impose any rigid rules as to how much money each school district must receive." *Danson*, 399 A.2d at 369 (Manderino, J., dissenting).

[45] There is ample dispute regarding the relationship between the amount of money spent on education and the results of same. For example, in dissent in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), Justice Marshall observed that "[i]t is an inescapable fact that if one district has more funds available per pupil than another district, the former will have greater choice in educational planning than will the latter. . . . I believe the question of discrimination in educational quality must be deemed to be an objective one that looks to what the State provides its children, not to what the children are able to do with what they receive." *Id.* at 83-84 (Marshall, J., dissenting); *see also id.* at 83 n.40 (noting authorities espousing contrary views).

a thorough and efficient system of public schools,' [*Teachers' Tenure Act Case*, 197 A. at 352,] the General Assembly has fulfilled its constitutional duty." *Marrero I*, 709 A.2d at 964 (quoting *Danson*, 399 A.2d at 367). The Commonwealth Court determined that the financing scheme enacted by the General Assembly was reasonably related to its constitutional mandate and was neutral with regard to the district, providing that district with a "fair share" of state subsidies. Consequently, the legislative scheme did not violate the Education Clause. Having so declared, the Commonwealth Court then circled back to observe, in the same terminology applied in the *Teachers' Tenure Act Case*, that it would "not inquire into the reason, wisdom, or expediency of the legislative policy with regard to education, nor any matters relating to legislative determinations of school policy or the scope of educational activity." *Id.* at 965. Thus, in *Marrero I*, as in *Danson*, and unlike in the *Teachers' Tenure Act Case* upon which both decisions purported to rely, the court deemed the question non-justiciable, even as it utilized language suggesting its review and rejection of the underlying challenge on the merits. *Marrero I*, 709 A.2d at 965-66.

The *Teachers' Tenure Act Case*, *Danson*, and *Marrero II* necessarily inform our consideration regarding the justiciability of Petitioners' Education Clause and equal protection claims. But to rely uncritically upon their analyses and holdings would be to rest our decision upon an unstable three-legged stool. The account above makes clear just how little weight that stool can bear. The first of these three cases assessed legislative discretion alone, implicitly and necessarily treating a claimed violation of the Education Clause as justiciable. The *Teachers' Tenure Act Case* can be construed either as establishing a standard of review by which to review Education Clause

challenges, in the form of the reasonable relation test, or as one cursorily dismissing plaintiffs' claim upon the strength of future legislatures' discretion to modify education policy. In fact, that future legislative discretion was not impaired by the Act in question, given that the Act could be repealed or amended at any time. Then, in *Danson*, the Court seemed to vindicate deferential merits review in its recitation and apparent application of the reasonable relation standard, only to follow that with what appeared to be a determination that the challenge was not justiciable. The Court based this pivot upon the manifestly debatable premises that: (a) the only judicially discoverable and manageable standard for resolving such a challenge would be to require equal per capita expenditures statewide; and (b) the imposition of any judicially-defined standard whatsoever necessarily would preclude the General Assembly's continued salutary experimentation with education policy. Then came *Marrero I and II*, wherein the Commonwealth Court, and then this Court, adopted *Danson* wholesale, warts and all, again applying the political question doctrine and reasonable relationship test simultaneously—and irreconcilably.

For what little developed reasoning there is to be gleaned from our prior three cases, we must conclude that the slate relative to the instant challenges is, if not clean, then at least relatively unadorned by any harmonious rule of law that controls the instant matter. Thus, in addressing Petitioners' claims in this case, we must consider anew the *Baker* factors as to each claim.

### D. Justiciability and the Education Clause

In evaluating the factors and their application to Petitioners' Education Clause claim, we focus upon the first three factors: a textually demonstrable commitment to the

General Assembly, a lack of judicially discoverable and manageable standards,[46] and

an inability to decide the question without an initial policy determination not appropriate

for judicial discretion. These three factors are closely interrelated.[47]

### 1.      *Textual Commitment*

With regard to the textual commitment factor, *Sweeney* and *Robinson Township*,

*inter alia*, have made clear that *mere* textual commitment of a given function to a given

branch of government does not by itself preclude judicial review. *See, e.g., Robinson*

*Twp.*, 83 A.3d at 928 ("Courts will refrain from resolving a dispute and reviewing the

actions of another branch only where the determination whether the action taken is

within the power granted by the Constitution has been entrusted exclusively and finally

to the political branches of government for self-monitoring.") (internal quotation marks

omitted). Thus, there must be some indication that vested within the Education Clause

mandate is the obligation and prerogative to "self-monitor." That the mandate charges

the General Assembly with maintaining and supporting "a thorough and efficient system

of public education" by no means implies that the legislature's efforts at doing so may

---

[46]       The *Nixon* Court observed that the "textually demonstrable constitutional commitment" and "judicially discoverable and manageable standards" factors under *Baker* "are not completely separate; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Nixon*, 506 U.S. at 228-29; *see id.* at 240 (White, J., concurring) ("[C]ourts are sometimes aided by textual evidence that the Judiciary was not meant to exercise judicial review—a coordinate inquiry expressed in *Baker*'s 'lack of judicially discoverable and manageable standards' criterion.").

[47]       Like the parties, the following three factors we find immaterial to the instant case: an inability to resolve the issue without expressing a lack of respect for the coordinate branches of government, an unusual need for unquestioning adherence to a political decision already made, and "the potential for embarrassment from multifarious pronouncements by various departments on one question." *Robinson Twp.*, 83 A.3d at 928.

be graded exclusively by that body without judicial recourse. We find no evidence from which to draw such a broad conclusion when it is antithetical to our prior stringent accounts of the textual commitment factor in *Sweeney*, *Robinson Township*, and other cases. This is especially so in light of the well-documented suspicion with which the framers of the 1874 Constitution viewed legislative overreach.[48] Thus, any such implication must lie in the close relationship between the textual commitment factor and the lack of judicially discoverable and manageable standards factor that has been recognized in the past. *See Nixon*, 506 U.S. at 228-29.

### 2. Judicially Manageable Standards and Initial Policy Determinations

In proposing a basis upon which to harmonize rather than abrogate our prior decisions,[49] Petitioners, in sum, suggest that the recent proliferation of federal and state

---

[48]     *See supra* at 12 & n.13.

[49]     While Petitioners, perhaps in an abundance of circumspection, decline to suggest that this Court should abrogate our prior case law, the Law School Professors as *Amicus Curiae* are not so shy. They argue forthrightly that *Marrero II* should be reconsidered and perhaps overruled. Executive Branch Respondents underscore that Petitioners have not taken that strong of a position. Brief for Executive Respondents at 21 & n.8. They correctly note that issues raised only by friends of the Court may not be considered. *Id.* (citing *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 109 n.8 (Pa. 1999)). Thus, they effectively contend that Petitioners' failure to make a frontal attack upon our prior Education Clause case law forecloses this Court's ability to consider in this case the soundness and viability of our earlier decisions.

Respondents are correct to the extent that the question of the ongoing tenability of *Danson*, *Marrero II,* and the cases upon which they were based is not expressed in the questions as to which we granted review, both of which inquire as to the justiciability of Petitioners' claims. In reviewing those decisions, though, our final determination as to whether and how they apply to this case requires us to consider their internal consistency as well as the cogency of their reasoning. Put another way, if, in seeking to harmonize these cases and apply them to the case before us, we find that we cannot do so with due rigor, we cannot look the other way simply because to abrogate prior precedent in the process of resolving this case is more than Petitioners have asked us (continued…)

curricular mandates, in tandem with elaborate student assessment and school accountability measures, reflect a sea change in the legislative imposition of standards. Specifically, the advent of the modern era of Common Core curricula and elaborate tools for assessing educational success, such as the PSSA and Keystone Exams, contradict any argument that there are no judicially enforceable standards that might apply to test the General Assembly's satisfaction of its mandate. And because a court can rely upon standards already established by the legislature to make a circumstance-specific determination of educational adequacy without fashioning a fixed baseline standard out of whole cloth, judicial oversight does not require an intrusion upon the General Assembly's policy-making function. Petitioners explain as follows:

> After defining what children should learn in school (and imposing significant consequences on those who fall short), the legislature has a duty under the Education Clause to provide funding sufficient to ensure that all students are given an opportunity to actually learn it. That duty flows from the plain language of the Education Clause . . . . The legislature's current definition of a "thorough and efficient system of public education"—as related in state academic standards and other legislative enactments—thus defines the scope of its financial support obligations. In other words, the Constitution requires the legislature to maintain and support the system that the legislature itself has mandated.

Brief for Petitioners at 33-34.

Petitioners reinforce this line of reasoning by reviewing other state courts that have applied it in reviewing (on the merits) legislative compliance with their respective

---

(…continued)
to do. We would encourage the perpetuation of poorly reasoned precedent were we to permit ourselves to revisit the soundness of our case law only when expressly invited to do so based upon a given party's tactical decision of whether to attack adverse case law frontally (always a gamble against long odds) or to attempt more finely to distinguish the adverse decisions. The scope of our review is not so circumscribed. *See Freed v. Geisinger Med. Ctr.*, 5 A.3d 212, 231 (Pa. 2010) (noting that testing the validity of the Superior Court's ruling distinguishing one of our prior cases may entail reviewing the validity of the case in question).

education clauses. Petitioners acknowledge that some school districts may have poor test results due to "local mismanagement or ineffective teachers," even where the General Assembly has allocated the resources necessary to provide the education that the legislature itself has demanded. But Petitioners underscore that this is distinct from judicially assessing the alleged *systemic* inability of many school districts to satisfy legislative standards given their limited resources, an infirmity curable only with greater state assistance, given certain districts' limited property tax bases and taxing authority. By way of reinforcement, Petitioners review their pleading's allegations and recite a series of "abysmal" performance numbers[50] from various school districts. *Id.* at 36 (citing Petition at 65-67 ¶ 156). They underscore that universal satisfaction of performance thresholds is not the goal. Rather, the General Assembly's obligation lies in providing sufficient support to all school districts to ensure that their students have the opportunity to meet the General Assembly's and Department of Education's stated thresholds.

With regard to the funding component of providing such support, Petitioners point to the 2006-08 costing-out study ordered and obtained by the General Assembly. They contend that, while the General Assembly effectively has defined an "adequate" education either through, or at least by inference from, the various performance standards it has imposed upon school districts, it also has access (as do the courts) to its own district-by-district costing-out study. This study may be used to determine

---

[50] They note that Shenandoah Valley's numbers were so poor in 2013 that, were they to persist, only 36% of students would have graduated high school in the 2016-17 school year. Further, Petitioners allege that Shenandoah Valley's scores were the highest of all the petitioning school districts. Brief for Petitioners at 36-37.

whether the state's financial support, in its magnitude and distribution, provides the opportunity to succeed relative to the state's own benchmarks.

As to *Baker*'s "initial policy judgment" factor, Petitioners seek to distinguish, in effect, holding the General Assembly's feet to the fire broadly from conducting a full inquisition on the particulars. Petitioners suggest that no such policy judgment need be made in assessing the adequacy of the resources dedicated by the General Assembly to support fulfillment of objectives delineated by that selfsame body. Petitioners close by reviewing various decisions from other jurisdictions in which courts "crafted effective and noninvasive remedies to address education clause violations." *Id.* at 41-43. In light of these developments over the past twenty years, Petitioners argue that it is incongruous for Respondents now to maintain that it is impossible for a court to fashion a constitutional threshold for educational adequacy.

Respondents reply that it would be unreasonable to take a snapshot of legislative standards at a moment in time and confer constitutional status upon that snapshot. They suggest that, at any given moment, the legislature may be doing far more than any reasonable interpretation of the Constitution would require, implicitly arguing that the General Assembly should retain latitude to do less. Respondents further argue that to adopt a fixed constitutional standard based upon any particular suite of benchmarks imposed by the General Assembly limits the legislative freedom to experiment with education policy in response to changing needs and innovations. The necessity of this freedom is precisely the one unequivocal proposition that may reasonably be inferred from the *Teachers' Tenure Act Case*, *Danson*, and *Marrero II*. Alternatively, if a court was to enshrine the standards of the moment as the constitutional threshold, but leave

open the door to future legislative changes with the expectation that *those* standards then would become constitutional, such a holding would render our own rulings merely perfunctory. More perniciously, Respondents say, the General Assembly might be encouraged to lower standards simply to deflect whatever judicial oversight might remain, enshrining utter and *de facto* legislative prerogative without acknowledging it as such.[51]

Respondents then adopt the dubious premise accepted without material explanation by the *Danson* and *Marrero II* Courts that financial equalization offers the only judicially manageable standard. To impose such a standard would confound the constitutional design in numerous particulars. First, it would contradict the framers' specific consideration and rejection of a uniformity requirement. Second, it would undermine the enduring emphasis on local prerogatives that long has animated education policy in the Commonwealth and elsewhere.[52]

It is true that Petitioners lean heavily upon the strict academic standards embodied in the General Assembly's measures of educational success, without

---

[51] Respondents' argument that the General Assembly alone has authority to monitor its own compliance with the Education Clause renders this argument hollow. If Respondents prevail, the General Assembly would be free to defund education entirely without the interference of any other branch of government, subject only to the vicissitudes of the next election cycle. Accordingly, nothing this or any other court does will increase the chance of the proverbial race to the bottom. On the Respondents' own account, the General Assembly can race to the bottom whenever it chooses for all anyone else can do to interfere.

[52] Presumably, given finite state resources, equalization of expenditures could be achieved only by capping what wealthier districts could spend on their schools. This is precisely what Justice Manderino disputed when he disagreed with the *Danson* majority that petitioners in that case sought any particular amount of funding for all districts as a proxy for educational adequacy. *See supra* n.44.

expressly allowing that the constitutional threshold found by a court might lie somewhere below that level or be differently described. *See* Petition at 120-21 ¶¶ 313-14, 320-21 (seeking a court order directing, *inter alia*, that the General Assembly establish a "school[ ]financing arrangement that is reasonably calculated to ensure that all students in Pennsylvania have an opportunity to obtain an adequate education that will enable them to meet state academic standards"). It is reasonable to maintain that these measures necessarily are mutable, and are ill-suited, as such, to serve as a constitutional minimum now or in the future. Nonetheless, Petitioners also request relief aimed at a more general purpose: a declaration that the General Assembly must provide the "support necessary to ensure that all students have the opportunity to obtain an adequate education that will enable them to . . . participate meaningfully in the economic, civic, and social activities of our society." *Id.* at 120-21 ¶ 314.[53] This is distinct from Petitioners' parallel prayers for the relief they seek in explicitly financial terms or in terms of the curricular mandates of the moment. That is to say, Petitioners' reliance upon today's statutory or regulatory standards, or any particular standardized testing measures, is by no means exclusive.

Even when Petitioners speak in financial terms, they do not conjure the straw man of funding equality or fixed standards so critical to this Court's reasoning in *Danson* and *Marrero II*. To the contrary, they posit that there exists a threshold level of "adequacy" that is a condition precedent to systemic thoroughness and efficiency in the

---

[53] *See* Petition at 122 ¶ 320 (seeking permanent injunctive relief directing the Commonwealth to "establish, fund, and maintain a thorough and efficient system of public education that provides all students in Pennsylvania with an equal opportunity to obtain an adequate education").

constitutionally-intended sense for which the General Assembly is responsible. Consonantly, Petitioners never dispute that individual districts should be free to utilize local funding sources to elevate their standards above the constitutional floor. Accordingly, we will not impute to Petitioners the desire for funding equality that, once posited, necessarily short-circuits an appropriately rigorous discussion of how courts might ensure that the Education Clause is more than merely hortatory without unduly infringing legislative prerogatives.

If we accept Respondents' framing, the question of standards answers itself. Surely, it cannot be correct that we simply constitutionalize whatever standards the General Assembly relies upon at a moment in time, and then fix those as the constitutional minimum moving forward, if only because at that point our oversight function would be merely symbolic. But we must remember that the question presented is not *what* standard a court might employ in assessing the General Assembly's satisfaction of its mandate, but whether *any* conceivable judicially enforceable standard might be formulated and applied after the development of an adequate record consisting of an array of proposals as to how a court might fairly assess thoroughness and efficiency.[54] That Petitioners focus upon the web of standards presently imposed

---

[54] Whatever definition of thoroughness and efficiency further study might recommend, one must bear in mind the broad array of deficiencies alleged by Petitioners. *See* Petition at 72-105 (averring, *inter alia*, teacher shortages and classroom overcrowding, crumbling infrastructure, unavailability of the most basic of learning materials, and so on). It is incorrect to suggest that these reduce to nothing more than a prayer for more money. To the contrary, Petitioners argue consistently that it is the General Assembly's obligation to give each child an opportunity to obtain an "adequate" education, with the current elaborate matrix of assessments and benchmarks merely indicative that such an opportunity is susceptible of measurement and enforcement.

upon districts by the General Assembly and the Department of Education as offering judicially enforceable standards for constitutional purposes does not mean that we should decide at this juncture whether those standards are suitable. Nor does it foreclose the prospect that the Commonwealth Court on remand may fashion an entirely different standard, as is its prerogative by virtue of Petitioners' request for "such other and further relief as the [c]ourt may deem just and proper." Petition at 123 ¶ 324; *see Lower Frederick Twp. v. Clemmer*, 543 A.2d 502, 512 (Pa. 1988) ("A prayer for general relief is as broad as the equitable powers of the court. Under such a prayer a chancellor in equity may grant any relief that is consistent with the theory and purpose of the action."); *Meth v. Meth*, 62 A.2d 848, 849 (Pa. 1949) (same).

It would be folly to suggest that creating a practicable standard by which courts might define and measure the thoroughness and efficiency of a given statutory educational scheme presents no formidable challenge. But we are not called upon to propose such a definition now. Our sister states, which have sought to do so by reference to the history of their own constitutions, have taken the most sensible approach. *See, e.g., Hornbeck v. Somerset Cnty. Bd. of Ed.*, 458 A.2d 758, 770-81 (Md. 1983). Because their histories are not ours, only their analytic approach is relevant at this juncture. The results of such an inquiry in Pennsylvania may vary.

The examples offered by other jurisdictions are worth reviewing, if only to gain some sense of what happens when a court does not shy away from developing a broad, flexible judicial standard for assessing legislative fulfillment of a constitutional mandate to furnish public education while remaining sensitive to the legislature's sole prerogative

to negotiate the particular policies that will satisfy it.[55]   The West Virginia Supreme

Court, whose education clause provides that "[t]he Legislature shall provide, by general

law, for a thorough and efficient system of free schools,"[56] after carefully surveying the

history of the framing of its clause, set forth the following standard:

> [A thorough and efficient system of schools] develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically.
>
> Legally recognized elements in this definition are development in every child to his or her capacity of (1) literacy; (2) ability to add, subtract, multiply and divide numbers; (3) knowledge of government to the extent that the child will be equipped as a citizen to make informed choices among persons and issues that affect his own governance; (4) self-knowledge and knowledge of his or her total environment to allow the child to intelligently choose life work to know his or her options; (5) work-training and advanced academic training as the child may intelligently choose; (6) recreational pursuits; (7) interests in all creative arts, such as music, theatre, literature, and the visual arts; (8) social ethics, both behavioral and abstract, to facilitate compatibility with others in this society.
>
> Implicit are supportive services: (1) good physical facilities, instructional materials and personnel; (2) careful state and local supervision to prevent waste and to monitor pupil, teacher and administrative competency.

*Pauley v. Kelly*, 255 S.E.2d 859, 877 (W.Va. 1979); *see Leandro v. State*, 488 S.E.2d

249, 255 (N.C. 1997) (providing a similar enumeration of goals); *see also Campaign for*

---

[55]   Challenges to states' school financing schemes under their education clauses have occurred nationwide over roughly the past forty years, with a broad diversity of results.  The scholarly and other literature on this topic is voluminous, and well beyond the scope of this Opinion.  However, the following articles would be helpful to a reader seeking more information on the topic: Regina R. Umpstead, *Determining Adequacy: How Courts are Redefining State Responsibility for Educational Finance, Goals, & Accountability*, 2007 B.Y.U. Educ. & L.J. 281 (2007); John Dayton & Anne Depre, *School Funding Litigation: Who's Winning the War?*, 57 Vand. L. Rev. 2351 (2004); Kelly Thompson Cochran, *Beyond School Financing: Defining the Constitutional Right to an Adequate Education*, 78 N.C. L. Rev. 399 (2000).  For a Pennsylvania-focused discussion, *see* Ambrose, *supra* n.18.

[56]   *See* W.V. Const. art. XII, § 1.

*Fiscal Equity, Inc. v. State*, 801 N.E. 2d 326, 330 (N.Y. 2003) ("[W]e equate a sound basic education with the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury."). The Supreme Courts of both Washington and Tennessee focused on defining education itself.[57]

---

[57] The Washington Supreme Court:

"[E]ducation" in its total or ultimate sense . . . comprehends all that series of instruction and discipline which is intended to enlighten the understanding, correct the temper, and form the manners and habits of youth, and fit them for usefulness in the future. In its most extended signification it may be defined, in reference to man, to be the act of developing and cultivating the various physical, intellectual, aesthetic and moral faculties.

*Seattle Sch. Dist. No. 1 of King Cnty. v. State*, 585 P.2d 71, 94 (Wash. 1978).

The Tennessee Supreme Court:

As used in [the Tennessee Constitution], the word 'education' has a definite meaning and needs no modifiers in order to prescribe the precise duty imposed upon the legislature. The first definition of 'education' in the unabridged edition of *The Random House Dictionary of the English Language*, 454 (2d ed. 1987) is: "The act or process of imparting or acquiring general knowledge, developing the powers of reasoning and judgment, and generally of preparing oneself or others intellectually for mature life" . . . . [The constitutional mandate requires] that the General Assembly shall maintain and support a system of free public schools that provides, at least, the opportunity to acquire general knowledge, develop the powers of reasoning and judgment, and generally prepare students intellectually for mature life. . . . *[T]his is an enforceable standard for assessing the educational opportunities provided in the several districts throughout the state.*

*Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 150 (Tenn. 1993) (emphasis added); *cf. Davis v. State*, 804 N.W.2d 618, 643 n.37 (S.D. 2011) (allowing that "[l]anguage and its meaning can change with time," and noting cases in which other courts employed older dictionaries to give meaning to terms relative to when they were employed in law, including *Campbell County School District v. State*, 907 P.2d 1238, 1258 (Wyo. 1995), which used an 1889 dictionary to define, *inter alia*, "thorough and efficient").

Notably, the chapter of the Pennsylvania Administrative Code that concerns academic standards and assessment offers an aspirational account of what the public education system should provide each student. It essentially echoes the standards offered in *Pauley* and *Leandro*, *supra*:

**Purpose of public education.**

(a)     This section and § 4.12 (relating to academic standards) describe the purpose of public education and its relationship with the academic standards.

(b)     Public education prepares students for adult life by attending to their intellectual and developmental needs and challenging them to achieve at their highest level possible. In conjunction with families and other community institutions, public education prepares students to become self-directed, life-long learners and responsible, involved citizens.

(c)     Together with parents, families and community institutions, public education provides opportunities for students to:

   (1) Acquire knowledge and skills.

   (2) Develop integrity.

   (3) Process information.

   (4) Think critically.

   (5) Work independently.

   (6) Collaborate with others.

   (7) Adapt to change.

* * * *

(e)     Achievement of high academic standards in public education is dependent upon the quality of instruction in schools and student effort supported by the involvement of family and community.

* * * *

(g)     Public schools provide instruction throughout the curriculum so that students may develop knowledge and skills in the following areas:

(1) English language arts.

(2) Mathematics.

(3) Science and technology.

(4) Environment and ecology.

(5) Social studies (civics and government, geography, economics and history).

(6) Arts and humanities.

(7) Career education and work.

(8) Health, safety and physical education.

(9) Family and consumer science.

22 Pa. Code § 4.11 (amended Feb. 16, 2008, Oct. 16, 2010, and Mar. 1, 2014). In light of this formulation, it is somewhat incongruous for Respondents to maintain that there is no prospect that a court could fashion a constitutionalized account not unlike this one, and measure the state of public education against that rubric, just as other states have done.

The widespread recognition that the essential concepts at issue are amenable to definition underscores the difficulty with a *per se* rule of non-justiciability. It is instructive that so many other states have found claims under their respective education clauses to be justiciable, either explicitly in the face of political question challenges, or implicitly by analyzing at length the merits of the challenges at issue. *See Conn. Coal. for Justice in Educ. Funding, Inc., v. Rell*, 990 A.2d 206, 225 n.24 (Conn. 2010) (citing cases to establish that "the vast majority of jurisdictions 'overwhelmingly' have concluded that claims that their legislatures have not fulfilled their constitutional responsibilities under their education clauses are justiciable"). Most compelling are those cases that address

constitutions employing the "thorough and efficient" language familiar from our own Education Clause. In addition to West Virginia, these include Maryland, Minnesota, New Jersey, Ohio, Wyoming, and Illinois.[58] It also is useful to consider those cases in tandem with cases reviewing other education clauses that employ qualitative language—*i.e.*, that which is amenable to interpretation[59]—which by and large have been treated as justiciable.[60] Still other states have considered the merits of challenges

---

[58]  *See Hornbeck*, 458 A.2d 758 (implicit finding of justiciability based upon merits review); *Skeen v. State*, 505 N.W.2d 299 (Minn. 1993) (implicit); *Abbott by Abbott v. Burke*, 575 A.2d 359 (N.J. 1990) (implicit); *DeRolph v. State*, 677 N.E.2d 733 (Ohio 1997) (explicit rejection of justiciability challenge); *Pauley*, 255 S.E.2d 859 (implicit); *Campbell Cnty. Sch. Dist.*, 907 P.2d 1238 (implicit); *Comm. for Educ'l Rights v. Edgar*, 672 N.E.2d 1178, 1191-93 (Ill. 1996) (implicitly deeming justiciable challenge based on claim that "efficient" education required broad-based parity, but deeming non-justiciable claim that system violated distinct "high quality" requirement); *see also* Brief *Amici Curiae* of Law Professors at 25-27.

[59]  We are not alone in identifying this characteristic as relevant to justiciability. In *Connecticut Coalition for Justice*, 990 A.2d at 232, the court noted the distinction between states, like Pennsylvania, that employ qualitative language and those that do not, and found that even words such as "elementary," "secondary," and "school" "have a qualitative connotation" rendering the constitutional language less than self-explanatory, and therefore needful of interpretation. Commentators alike have sorted education clauses into discrete categories. *See generally* Dinan, *supra* n.11 (relying upon records of various states' convention debates); Gershon M. Ratner, *A New Legal Duty for Urban Public Schools: Effective Education in Basic Skills*, 63 TEX. L. REV. 777, 814-16 (1985) (identifying four "basic groups": those containing only general education language; those emphasizing the quality of public education (such as Pennsylvania's "thorough and efficient" requirement); those containing a stronger, more specific mandate; and those stated most strongly, such as the Washington Constitution, which directs that "it is the paramount duty of the state to make ample provision for the education of all children residing within its borders"); William E. Thro, *Note, To Render Them Safe: The Analysis of State Constitutional Provisions in Public School Finance Reform Litigation*, 75 VA. L. REV. 1639, 1662-68 (1989) (identifying four categories of education clause).

[60]  *See DuPree v. Alma Sch. Dist. No. 30 of Crawford Cnty.*, 651 S.W.2d 90 (Ark. 1983) (implicitly treating as justiciable clause calling for "general, suitable and efficient system"); *Rose*, 790 S.W.2d 186 (alluding to justiciability challenge but no express decision rejecting it, in reviewing constitutional provision requiring "efficient system"); *Neeley v. W. Orange-Cove Consol. Ind. Sch. Dist.*, 176 S.W.3d 746 (Tex. (continued…)

to constitutional provisions that arguably do *not* employ qualitative language.[61]

Conversely, a minority of courts have declined the judicial review function entirely on precisely the grounds that Respondents invoke now.[62]

(…continued)

2005) (explicitly rejecting justiciability challenge; "efficient" system). Similarly, various requirements of "liberal," "quality," "adequate," "general," "thorough," "common," and/or "uniform" education systems have been treated as justiciable. *See Roosevelt Elem. Sch. Dist. No. 66 v. Bishop*, 877 P.2d 806 (Ariz. 1994) (implicit); *Serrano v. Priest*, 557 P.2d 929 (Ca. 1976) (implicit); *Lobato v. State*, 218 P.3d 358 (Co. 2009) (explicit); *Haridopolos v. Citizens for Strong Schools, Inc.*, 81 So.3d 465 (Fla. Ct. App. 2011), *review denied*, 103 So.3d 140 (Fla. 2012) (explicit); *McDaniel v. Thomas*, 285 S.E.2d 156 (Ga. 1981) (explicit); *Thompson v. Engelking*, 537 P.2d 635 (Idaho 1975) (implicit); *Columbia Falls Elem. Sch. Dist. No. 6 v. State*, 109 P.3d 257 (Mont. 2005) (explicit); *Matthews v. State*, 428 P.2d 371 (Nev. 1967) (implicit); *Leandro*, 488 S.E.2d 249 (explicit); *Bismarck Pub. Sch. Dist. No. 1 v. State*, 511 N.W.2d 247 (N.D. 1994) (implicit); *Davis v. State*, 804 N.W.2d 618 (S.D. 2011) (explicit, in a parting footnote); *Kukor v. Grover*, 436 N.W.2d 568 (Wis. 1989) (implicit). Similarly, the Washington Supreme Court considered the merits of a challenge to its education clause, which established a "paramount duty of the state to make ample provision for the education of all children residing within its borders." *Seattle Sch. Dist.*, 585 P.2d 71 (explicit); *see Unified Sch. Dist. No. 229 v. State*, 885 P.2d 1170 (Kan. 1994) (implicit under education clause that provides "[t]he legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools"); *Comm. for Educ'l Equality v. State*, 294 S.W.3d 477 (Mo. 2009) (implicit; clause provides "[a] general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the general assembly shall establish and maintain free public schools"). The Massachusetts Supreme Judicial Court also adjudicated such a challenge, despite its unusually lengthy, diffuse constitutional provision concerning education. *See McDuffy v. Sec. of Exec. Office of Educ.*, 615 N.E.2d 516 (Mass. 1993) (implicit); *see also Claremont Sch. Dist. v. Governor*, 703 A.2d 1353 (N.H. 1997) (implicit).

[61] *McGary v. Barrows*, 163 A.2d 747 (Me. 1960) (implicit; clause provides "[i]t shall be [the legislature's] duty to require[] the several towns to make suitable provision . . . for the support and maintenance of public schools"); *E. Jackson Pub. Schools*, 348 N.W.2d 303 (Mich. 1984) (implicit; clause provides "[t]he legislature shall maintain and support a system of free public elementary and secondary schools as defined by law"); *Pascagoula Sch. Dist. v. Tucker*, 91 So.3d 598 (Miss. 2012) (implicit; clause provides "[t]he Legislature shall . . . provide for the establishment, maintenance and support of free public schools); *Campaign for Fiscal Equity*, 801 N.E.2d 326 (implicit; clause provides "[t]he legislature shall provide for the maintenance and support of a system of free common schools"); *Abbeville Cnty. Sch. Dist. v. State*, 767 S.E.2d 157 (S.C. 2014) (continued…)

(…continued)

(explicit; clause provides "[t]he General Assembly shall provide for the maintenance and support of a system of free public schools"); *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139 (Tenn. 1993) (implicit; clause provides "the General Assembly shall provide for the maintenance, support, and eligibility standards of a system of free public schools"); *Brigham v. State*, 889 A.2d 715 (Vt. 2005) (explicit; clause provides "a competent number of schools ought to be maintained in each town unless the general assembly permits other provisions for the convenient instruction of youth").

[62]     *See Ex Parte James*, 836 So.2d 813 (Ala. 2002) (finding challenge non-justiciable under education clause expressing the policy of Alabama "to foster and promote the education of its citizens in a manner and extent consistent with its available resources," which clause specifies that the provision should not be construed to "creat[e] or recognize[e] any right to education . . . at public expense"); *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516 (Ind. 2009) (finding challenge non-justiciable under education clause requiring "general and uniform" education); *Okla. Educ. Ass'n v. State ex rel. Okla. Legislature*, 158 P.3d 1058 (Okla. 2007) (finding challenge non-justiciable under constitution requiring establishment and maintenance of "a system of free public schools"); *City of Pawtucket v. Sundlun*, 662 A.2d 40 (R.I. 1995) (finding challenge non-justiciable under clause directing general assembly "to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education"); *cf. Comm. for Educ'l Rights v. Edgar*, 672 N.E.2d 1178 (Ill. 1996) (distinguishing between education clause challenges based upon normatively adequate education and disparities in funding from one based upon claim concerning whether state educational institutions were "high quality," and deeming only the last of these to be non-justiciable).

Notably, a majority of states whose courts have found education clause challenges non-justiciable have education clauses that contain the sort of facial textual commitment of self-monitoring that we find absent in our own Education Clause. For example, the Oregon Constitution, in Article VIII, Section 8, directs the state assembly to appropriate "a sum of money sufficient to ensure that the state's system of public education meets quality goals *established by law*" (emphasis added). The Virginia Constitution, in Article VIII, Section 1, directs its assembly to "provide for a system of free public elementary and secondary schools . . ., and shall seek to ensure that an educational program of high quality is established and continually maintained," and, in Section 2, specifies that "[s]tandards of quality for the several school divisions shall be determined and prescribed from time to time by the Board of Education, subject to revision *only by the General Assembly*" (emphasis added). The Rhode Island Constitution provides that "it shall be the duty of the general assembly to promote public schools and public libraries, and to adopt all means which *it may deem necessary and proper* to secure to the people the advantages and opportunities of education and public library services." R.I. CONST. art. XII, § 1 (emphasis added). These suggest precisely the sort of textual commitment that might satisfy the *Robinson Township* requirement (continued…)

These many decisions stand for the proposition that courts in a substantial majority of American jurisdictions have declined to let the potential difficulty and conflict that may attend constitutional oversight of education dissuade them from undertaking the task of judicial review. Their methods of doing so, the standards and rigor they employ, and the degree of their deference to legislative determinations vary, as do the results of the cases they have considered. That a case is entertained on the merits hardly guarantees victory for either side. But it cannot be said that the inability to fashion a tidy, mechanical standard of review for such challenges has prompted many other states to abandon their judicial function.

Respondents argue, in effect, that this Court cannot define thoroughness and efficiency while still respecting the legislature's primacy in fashioning educational policy and preserving its ongoing flexibility to refine that policy to reflect pedagogical advances and to adapt to changing times and evolving needs. But centuries of litigation leading to judicially enforceable definitions of such vague terms as "probable cause," "due process," "equal protection," and "cruel and unusual punishment" undermine the argument. Courts give meaning routinely to all manner of amorphous constitutional concepts, including those that lie at the intersection of legislative prerogative and judicial review. And they do so while still leaving room for future development by whatever government body or mechanism the law fairly prescribes. Nor is this a phenomenon reserved for fundamental rights. The United States Supreme Court has given judicial meaning to such nebulous terms as "interstate commerce." *Cf. Nixon*, 506 U.S. at 246-

(…continued)
that the textual commitment include not only a mandate but also evidence that the framers intended the legislature to monitor its own compliance with that mandate.

47 (White, J., concurring) (noting that the Court has taken it upon itself to construe constitutional terminology such as "commerce," which it did in *Gibbons v. Ogden*, 22 U.S. 1, 72 (1924), and, more famously, "due process of law"); *Baker*, 369 U.S. at 226 ("Judicial standards under the Equal Protection Clause are well[-]developed and familiar . . . .").

The same is true of this Court. Recently, in *Robinson Township*, we rejected a justiciability challenge to claims that certain legislative actions failed to pay due regard to Article I, Section 27 of our Constitution, commonly referred to as the Environmental Rights Amendment. There, we were called upon to give enforceable meaning to terms like "clean air [and] pure water," "preservation of the natural, scenic, historic and esthetic values of the environment," and "natural resources," and we undertook to delineate how the Commonwealth might satisfy its mandate to "conserve and maintain [these natural resources] for the benefit of all the people." *See Robinson Twp.*, 83 A.3d at 969 (Opinion Announcing the Judgment of the Court).[63] We rejected the suggestion that the question was so political as to remove it from our purview. Surely, these terms are no more amenable to precise definition and mechanical application than a "thorough and efficient system of public education."

We must at times return a case to a legislative body for further action with only a broadly-stated mandate to serve as guidance. This was the effective outcome in

---

[63] Noting the dearth of jurisprudence interpreting the Environmental Rights Amendment, a plurality of justices in *Robinson Township* emphasized that, nonetheless, "this Court has an obligation to vindicate the rights of its citizens . . . in accordance with the plain language of the constitution." *Robinson Twp.*, 83 A.3d at 969. We also observed that "[t]he [interpretive] task is neither more nor less intrusive upon a coordinate branch function than in other matters in which we are called upon to determine the constitutional validity of a legislative act." *Id.* at 929.

*Robinson Township*. Furthermore, we have allowed claims to proceed even when the remedy might require increased funding for a government function, where the precise amount of funding necessary is not amenable to easy quantification. *See Kuren*, 146 A.3d 715 (reversing dismissal of injunctive claim based upon prospective violations of right to counsel due to county underfunding of indigent criminal defense resources); *cf. Pa. Env'l Defense Found. v. Commonwealth*, 161 A.3d 911 (Pa. 2017) (holding that the Environmental Rights Amendment, PA. CONST. art. I, § 27, imposes limitations, previously unrecognized, upon how the Commonwealth may dispose of the net proceeds of sales of public natural resources). And in *Pennsylvania Human Relations Commission v. Chester School District*, 233 A.2d 290 (Pa. 1967), finding that a school district was too racially segregated to pass constitutional muster (a determination that, itself, required a necessarily imprecise assessment), we upheld an administrative order directing the school district through its board, officers, and agents to submit a desegregation plan. Perhaps most notably, in *Holt v. 2011 Legislative Reapportionment Commission*, 38 A.3d 711 (Pa. 2012), we rejected a proposed legislative redistricting plan, notwithstanding the limited guidance we could offer the commission in remedying the constitutional failings that we had identified.

To the extent that our prior cases have suggested, if murkily, that a court cannot devise a judicially discoverable and manageable standard for Education Clause compliance that does not entail making a policy determination inappropriate for judicial discretion, or that we may only deploy a rubber stamp in a hollow mockery of judicial review, we underscore that we are not bound to follow precedent when it cannot bear scrutiny, either on its own terms or in light of subsequent developments. "Although this

Court adheres to the principle of *stare decisis*, it will not be bound by a decision that in itself is clearly contrary to the body of the law. In such instances, it is consistent with the principle underlying *stare decisis* to purify the body of law by overruling erroneous decisions." *Lewis v. W.C.A.B. (Giles & Ransome, Inc.)*, 919 A.2d 922, 928 (Pa. 2007); *see Ayala v. Phila. Bd. of Public Ed.*, 305 A.2d 877, 887-88 (Pa. 1973), *superseded by statute as recognized in Dorsey v. Redman*, 96 A.3d 332 (Pa. 2014) ("[I]f, after thorough examination and deep thought a prior judicial decision seems wrong in principle or manifestly out of accord with modern conditions of life, it should not be followed as controlling precedent."). As this Court previously has recognized, "[w]here . . . by our decisions . . . the Court distorted the clear intention of the legislative enactment and by that erroneous interpretation permitted the policy of that legislation to be effectively frustrated, we . . . have no alternative but to rectify our earlier pronouncements and may not blindly adhere to the past rulings out of a deference to antiquity." *Perry*, 798 A.2d at 707 & n.1 (Castille J., concurring) (quoting *Mayhugh v. Coon*, 331 A.2d 452, 456 (Pa. 1975), and observing that the principle "is no less applicable to constitutional provisions").

We find irreconcilable deficiencies in the rigor, clarity, and consistency of the line of cases that culminated in *Marrero II*. When presented with a case that hinges upon our interpretation and application of prior case law, the validity of that case law always is subject to consideration, and we follow the exercise of our interpretive function wherever it leads. *Cf. Commonwealth ex rel. Marigotti v. Lawrence*, 193 A. 46, 48 (Pa. 1937) (quoting 1 Cooley, CONSTITUTIONAL LIMITATIONS 121 (8th ed. 1977)) ("[W]hen a question involving important public or private rights, extending through all coming

time, has been passed upon on a single occasion, and which decision can in no just sense be said to have been acquiesced in, it is not only the right, but the duty, of the court, when properly called upon, to re-examine the questions involved, and again subject them to judicial scrutiny.").

For the foregoing reasons, we reject Respondents' and the lower courts' artificially narrow account of how a court may go about reviewing Education Clause challenges. We do not take at face value Petitioners' attempt to constitutionalize the standards of the day. But we agree with the broader proposition—long accepted by dozens of our sister courts—that it is feasible for a court to give meaning and force to the language of a constitutional mandate to furnish education of a specified quality, in this case "thorough and efficient," without trammeling the legislature in derogation of the separation of powers. This, of course, does not suggest that Petitioners' claims, or those of any future litigant, should or will prevail. The parties have had no opportunity to develop the historic record concerning what, precisely, thoroughness and efficiency were intended to entail, nor have they had an opportunity to develop a record enabling assessment of the adequacy of the current funding scheme relative to any particular account of the Constitution's meaning. We hold merely that Petitioners' claims cannot be dismissed as non-justiciable.

### E. Justiciability and Equal Protection

Petitioners' equal protection claim sounds in Article III, Section 32 of the Pennsylvania Constitution, not the Fourteenth Amendment to the United States Constitution. *See supra* n.3. However, we have held that the substantive content of the two provisions does not differ significantly. *Balt. & Ohio R. Co. v. Dep't of Labor &*

*Indus.*, 334 A.2d 636, 643 (Pa. 1975)); *accord Commonwealth v. Albert*, 758 A.2d 1149, 1151 (Pa. 2000). Hence, we may consider them together. Section 32 embodies the principle that "like persons in like circumstances should be treated similarly by the sovereign." *Robinson Twp.*, 83 A.3d at 987.

> Under a typical [equal protection] analysis of governmental classifications, there are three different types of classifications calling for three different standards of judicial review. The first type—classifications implicating neither suspect classes nor fundamental rights—will be sustained if it meets a "rational basis" test. In the second type of case[], where a suspect classification has been made or a fundamental right has been burdened, another standard of review is applied: that of strict scrutiny. Finally, in the third type of cases, if "important," though not fundamental rights are affected by the classification, or if "sensitive" classifications have been made, the United States Supreme Court has employed what may be called an intermediate standard of review, or a heightened standard of review.

*James*, 477 A.2d at 1305-1306. When applicable, strict scrutiny under equal protection requires the court to determine whether the classification is necessary to advance a compelling state interest. *D.P. v. G.J.P.*, 146 A.3d 204, 210 (Pa. 2016). If the rational basis test applies, then the classification in question must be "reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation.[64] In other words, a classification must rest upon some ground of difference which justifies the classification and have a fair and substantial relationship to the object of the legislation." *Albert*, 758 A.2d at 1151 (citation omitted). Since Petitioners undisputedly do not claim to comprise a class historically recognized as "suspect" under the United States or Pennsylvania Constitutions, they are entitled to elevated scrutiny only if they establish

---

[64] It is not lost on this Court that this "reasonable relationship" terminology closely tracks that of the "reasonable relation" test invoked, if opaquely employed, by this Court in the *Teachers' Tenure Act Case*, *Danson*, and *Marrero II*.

that they have an important or fundamental right to education. Failing that, Petitioners will prevail on their equal protection claim only if they establish that the school financing legislation has no rational basis for the classification it utilizes in allocating funds at the district level.

Although it did not do so in clear terms, it is difficult to understand the Commonwealth Court's conclusory rejection of Petitioner's equal protection claim as relying upon anything other than this Court's approach in *Danson*, in which we uncritically linked the plaintiff's equal protection claim to the Education Clause. To that extent, the Commonwealth Court's ruling in this case suffers from the same faults that have led us to identify little of precedential value in *Danson*. Indeed, the Commonwealth Court's disposition of the equal protection claim in the instant case depends so completely upon the outcome of the Education Clause claim that we could simply remand with direction that it consider that issue in light of our ruling with regard to the Education Clause. However, because we think it wrong to conflate Petitioners' equal protection claim with their Education Clause claims, we think it prudent to discuss their justiciability independently.

Despite some inevitable degree of overlap, Petitioners' pleading establishes the independence of their equal protection claim from their Education Clause claim. For example, Petitioners allege classifications by which even with the benefit of a relatively higher share of state funding some districts still have radically less to spend on their students than other districts that also receive state funding, albeit in smaller measure. And it is the classifications, not the absolute amounts, that form the basis of Petitioners' claims. *See* Petition at 5 ¶ 7 ("[T]he very low levels of state funding and unusually high

dependence on local taxes under the current financing arrangement have created gross funding disparities among school districts—an asymmetry that disproportionately harms children residing in districts with low property values and incomes."), 5 ¶ 8 (noting that "total education expenditures per student now range from as little as $9,800 per student in school districts with low property values and incomes to more than $28,400 per student in districts with high property values and incomes," an "unconscionable and irrational funding disparity [that] violates the Equal Protection Clause"); 32 ¶ 94 ("A school financing arrangement that denies children residing in school districts with low property values and incomes the opportunity to obtain an adequate education, *while providing sufficient resources to children in school districts with high property values and incomes*, is unconstitutional." (emphasis added)).  Further, as set forth at length, *supra*, even setting aside entirely the question of money, Petitioners assert myriad deficiencies in facilities and educational materials, staffing, programming, and so on that are not specifically couched in terms of funding, and that conceivably could be rectified by means other than increasing monetary allocations to the districts in question.

In alleging the Commonwealth's failure "to finance the Commonwealth's public education system *in a manner that does not irrationally discriminate against a class of children*," *id.* at 2 ¶ 1 (emphasis added), it is clear that it is the manner of distribution, not the quantum of financial resources distributed, that drives this claim.  Moreover, Petitioners' prayer for relief reinforces the distinction between their equal protection and Education Clause arguments.  *See, e.g.*, *id.* at 8 ¶ 13 (seeking an injunction compelling the legislature to halt *any* funding arrangement that "irrationally discriminates against children who live in school districts with low property values and incomes"); 121 ¶ 316

(seeking a declaration that equal protection "imposes upon Respondents an obligation to adopt a school[ ]financing arrangement that does not discriminate against students based on the amount of incomes and taxable property in their school districts"). In short, Petitioners' equal protection claims focus upon "the *method* by which education funds are raised and distributed—not the *overall* amount of funding." Brief for Petitioners at 26 (emphasis in original).[65] Thus, the Commonwealth Court erred to the extent that it determined that the fate of Petitioners' equal protection claims necessarily is tied to that of their Education Clause claims.

Treating Petitioners' equal protection claims as distinct leaves us with little basis upon which to deem them non-justiciable. On the question of justiciability, Respondents primarily rely upon the proposition that the fate of Petitioners' Education Clause claims dictates the fate of their equal protection claims. But our determination that the Education Clause claims are justiciable is fatal to that argument.

Application of the *Baker* factors does not suggest a different result.[66] To the extent that Petitioners' equal protection claim is tied to their Education Clause claim, the foregoing analysis governs, and the equal protection claim is justiciable. But treating the claims separately, we find no analysis by the Commonwealth Court, no argument by Respondents, nor anything in law to suggest how Petitioners' equal protection claim does not survive *Baker* scrutiny. If the Education Clause does not textually repose in the General Assembly the authority to self-monitor and self-validate its compliance with

---

[65] To the extent that their Petition read as a whole creates any ambiguity on this point, we emphasize that it is our obligation to read the Petition in the light most favorable to Petitioners' claims.

[66] The parties once again focus upon the first three *Baker* factors. *See supra* n.47.

that provision, certainly Article III, Section 32 does not do so, and no one suggests otherwise. Furthermore, there is little question that the rational basis/heightened scrutiny/strict scrutiny rubric that applies to equal protection claims is, by its very nature, a judicially discoverable and manageable standard, and one that does not require a policy determination that properly belongs to the legislature.

Of course, there is no question that, in addressing the latter two *Baker* concerns, the substance of the underlying legal issue informs the question of standards—the very phrase "equal protection of the law" presupposes some other law that must be applied equally to similarly situated parties. But in that sense, we find ourselves confronting our ruling as to the justiciability of the Education Clause claim, which leads to the same result in this instance. All of which is to say, our foregoing ruling effectively compels us to determine that Petitioners' equal protection claim is justiciable in the general sense. Neither the lower court nor Respondents suggest otherwise. Even if that were not the case, Petitioners' allegations raise the sort of equal protection questions that we nearly always treat as justiciable: Whether there exists a classification; whether it is suspect or subject to heightened scrutiny; whether it burdens a fundamental right; and whether the law is appropriately fashioned relative to the applicable standard of review. These are all commonplace inquiries in the courts, and involve neither undiscoverable nor unmanageable standards. Nor do they implicate initial policy considerations best left to the legislature. Rather, the court measures the legislature's initial policy consideration against a familiar, time-honored rubric that courts have applied on innumerable occasions.

In rebutting the existence of an individual right to education, Respondents rely in part on the United States Supreme Court's decision in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973). There, the Court faced a federal Equal Protection Clause challenge to the system by which Texas distributed state education funding, a challenge substantively quite similar to the claim at issue in the instant case. The Court ruled adversely to the plaintiffs in part based upon its determination that there is no right to education to be found in the United States Constitution. That was a consequence of the United States Constitution's conspicuous and complete silence on the very topic of education. This renders the High Court's determination on the question of an individual right immaterial to the Pennsylvania Constitution, which, obviously, is not at all silent on the topic. What is important to note in connection with this claim, however, is that the Court, as bound by *Baker* and its progeny as we are, did *not* find the challenge non-justiciable as a political question. Rather, the Court engaged in a quite lengthy analysis of the merits of the claim. Thus, in citing *Rodriguez*, Respondents effectively reinforce that Petitioners' equal protection claims are justiciable without regard to the viability of their Education Clause claims.[67]

This leaves the question of what sort of right is at issue. In turn, this will dictate what standard of review applies to Petitioners' equal protection claim, should it proceed. We need not resolve that question presently, but we underscore that whether education

---

[67] No political question challenge was raised or addressed in *Rodriguez*. However, in federal courts, unlike in Pennsylvania courts, *see supra* at 37-38, the question of justiciability, and specifically the political question doctrine, goes to the jurisdictional "case or controversy" requirement set forth in Article III of the United States Constitution. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974). Thus, the absence of discussion of the issue does not make less significant the Court's assertion of jurisdiction over the Equal Protection Clause claim.

is a fundamental right under Pennsylvania law is not a settled question simply because *Danson* and *Marrero II* suggested as much. To the contrary, we do not read any of our prior cases as settling whether the Pennsylvania Constitution confers an individual right to education—and, if so, of what sort. In the *Teachers' Tenure Act Case*, this Court distinguished a Pennsylvania with the benefits of mandated public education from one in which education is "scarce," "a privilege of the rich." 197 A. at 352. This might be taken as support for the proposition that the framers intended that what was once "a privilege of the rich" would, through the Education Clause, become a right vested in all Pennsylvanians. To similar effect, in *School District of Philadelphia v. Twer*, this Court observed that "financial concerns could not in any way dilute the primary responsibility to maintain 'a thorough and efficient system of public schools,'" and "that the maintenance of a public school system is primarily for the education and training of our youth." 447 A.2d 222, 224 (Pa. 1982). Thus, "the polestar in any decision requiring the assignment of priorities of resources available for education must be the best interest of the student." *Id.*[68]

---

[68] This is consistent with the intuition that to disregard the beneficiaries of a mandate is to render that mandate little more than a hortatory slogan. But this intuition is by no means shared by all. *Compare* Wesley Hohfeld, *Some Fundamental Conceptions as Applied in Judicial Reasoning*, 23 Yale L.J. 16, 32 (1913) (distinguishing rights from privileges, and observing that "'[d]uty' and 'right' are correlative terms"); *McDuffy v. Sec. of Exec. Office of Educ.*, 615 N.E.2d 516, 527 n.23 (Mass. 1993) ("[I]f 'legislatures and magistrates' have a constitutional duty to educate, then members of the Commonwealth have a correlative constitutional right to be educated."); *Seattle Sch. Dist. No. 1 of King Cnty. v. State*, 585 P.2d 71, 91 (Wash. 1978) (noting state's "paramount duty to make ample provision" for education, with the result that "all children residing within the [state] possess a 'right' arising from the constitutionally imposed 'duty' of the [s]tate") *with* Scott R. Bauries, *The Education Duty*, 47 Wake Forest L. Rev. 705, 706 (2012) (rejecting the proposition that individual rights arise as a necessary corollary of constitutional mandates imposed upon legislatures, (continued…)

Most explicit, of course, is our *dictum* in *School District of Wilkinsburg v. Wilkinsburg Education Association*: "[P]ublic education in Pennsylvania is a fundamental right. It is required by Article III, Section 14 of the Pennsylvania Constitution." 667 A.2d 5, 9 (Pa. 1995). However, in *Danson*, albeit implicitly, we rejected the notion that there was an individual right to education, a proposition that we made explicit in *Marrero II*. There, we approved what we characterized as *Danson*'s holding that our Constitution's educational mandate does not confer an "individual right upon each student to a particular level or quality of education." *Marrero II*, 739 A.2d at 112. The simple fact is that *none* of these cases conclusively decided the question, and to read any of them to the contrary is to confer upon them more precedential value on that question than they warrant. Furthermore, the mixed signals we may glean from our decisional law echo the conflicting array of rulings in other state courts confronting the same question.[69] We should not treat as settled a question that we have never answered conclusively.[70]

_____

(…continued)
and arguing in favor of analyzing legislative compliance with a given mandate as a question of fiduciary duty, "using the tools of deference appropriate to the review of discretionary decisions by individuals in positions of trust").

[69]    *See Serrano v. Priest*, 557 P.2d 929, 951-52 (Ca. 1976) ("fundamental interest" in education under provision requiring "a system of common schools by which free school shall be kept up and supported"); *Horton v. Meskill*, 376 A.2d 359, 373-74 (Conn. 1977) (fundamental right where constitution provides "[t]here shall always be free public elementary and secondary schools in the state"); *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 201 (Ky. 1989) (fundamental right to education where constitution directs the assembly to "provide for an efficient system of common schools"); *McDuffy v. Sec. of Exec. Office of Educ.*, *supra* n.68; *Claremont Sch. Dist. v. Governor*, 703 A.2d 1353, 1358-59 (N.H. 1997) (fundamental right based upon "the fact that [the] State Constitution specifically charges the legislature with the duty to provide public education" and "to cherish the interest of . . . public schools"); *Leandro*, 488 S.E.2d at 255 (framers intended to establish "a fundamental right to sound basic education" where (continued…)

education clause states that "[t]he people have a right to the privilege of education"); *Bismarck Pub. Sch. Dist. No. 1 v. State*, 511 N.W.2d 247 (N.D. 1994) (fundamental right under provision directing "a uniform system of free public schools"); *Kukor v. Grover*, 436 N.W.2d 568, 579 (Wis. 1989) (fundamental right under provision directing establishment of public schools that are "as nearly uniform as practicable"); *cf. Roosevelt Elem. Sch. Dist. No. 66 v. Bishop*, 877 P.2d 806 (Ariz. 1994) (noting inconsistencies in prior cases applying rational basis to so-called "fundamental right" but declining to determine whether such a right inhered under Arizona Constitution in that case); *DuPree v. Alma Sch. Dist. No. 30 of Crawford Cnty.*, 651 S.W.2d 90, 93 (Ark. 1983) (alluding to a right, but declining to determine whether it is fundamental because funding scheme did not pass rational basis review); *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139 (Tenn. 1993) (a "right to a free public education"); *Neeley v. W. Orange-Cove Consol. Ind. Sch. Dist.*, 176 S.W.3d 746, 784-85 (Tex. 2005) (rejecting fundamental right formulation *and* rational basis as well, holding that "[i]f the Legislature's choices are informed by guiding rules and principles properly related to public education—that is, if the choices are not arbitrary—then the system does not violate the constitutional provision"); *Seattle Sch. Dist. No. 1 of King Cnty. v. State*, *supra* n.68*. But see McDaniel v. Thomas*, 285 S.E.2d 156, 167 (Ga. 1981) (no fundamental right where constitution requires provision of an "adequate public education for the citizens"); *E. Thompson v. Engelking*, 537 P.2d 635 (Idaho 1975) (no fundamental right where constitution directs legislature to "establish and maintain a general, uniform and thorough system of public, free common schools"); *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 522 (Ind. 2009) (no right to education whatsoever); *Unified Sch. Dist. No. 229 v. State*, 885 P.2d 1170, 1189-90 (Kan. 1994) (no fundamental right under constitutional provision requiring establishment and maintenance of public schools); *Committee for Educ'l Rights v. Edgar*, 672 N.E.2d 1178, 1194-95 (Ill. 1996) (no fundamental right under requirement of "efficient system of high quality public educational institutions and services"); *Hornbeck*, 458 A.2d at 786 (no fundamental right but noting "Maryland's Constitution explicitly, not to mention implicitly, guarantees rights and interests which can in no way be considered 'fundamental'"); *Jackson Pub. Schools v. State*, 348 N.W.2d 303, 305 (Mich. 1984) (no fundamental right under provision requiring legislature to "maintain and support a system of free public elementary and secondary schools as defined by law"); *Committee for Educ'l Equality v. State*, 294 S.W.3d 477, 490-91 (Mo. 2009) (no fundamental right under provision requiring "free public schools for . . . gratuitous instruction"); *City of Pawtucket v. Sundlun*, 662 A.2d 40 (R.I. 1995) (no fundamental right where constitution required legislature "to promote public schools . . ., and to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education").

[70]    Some state courts interpreting constitutional provisions requiring the legislature to provide a "thorough and efficient" system of public schools have found an implicit, fundamental right.  *See Skeen v. State*, 505 N.W.2d 299 (Minn. 1993); *Pauley*, 255

(continued…)

For the foregoing reasons, we hold that the Commonwealth Court erred in determining that Petitioners' equal protection claim presented a non-justiciable political question. Viewed as necessarily derivative of Petitioners' Education Clause claim, Petitioners' equal protection claim is justiciable for the reasons set forth above. Viewed as an independent claim, we discern no basis in prior precedent or the arguments of the Respondents to establish that any of the *Baker* factors apply independently to bar judicial review. We decline at this time to address what individual right to education Petitioners may have, and concomitantly what level of scrutiny should apply to Petitioners' claims, as these issues lie outside the ambit of the justiciability question we are called upon to answer here. It suffices at this time to note that our prior precedent is inconclusive. We intend only to dispel any notion that our decision in *Marrero II* resolved the question as a matter of law.

## IV. Conclusion

Two decades after *Marbury*, in another paean to the importance of judicial review, Chief Justice Marshall cautioned that "[t]he judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the [C]onstitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821). The spirit of Chief Justice Marshall's cautionary refrain has informed the clear majority of state courts that have held it their judicial duty to construe interpretation-begging state education clauses like ours to

(…continued)
S.E.2d 859; *Campbell County School District v. State*, 907 P.2d 1238, 1257-58 (Wyo. 1995).

ensure legislative compliance with their constitutional mandates, no matter the difficulties invited or, in many cases, confronted. We hold that our Education Clause, viewed in the overarching context of our cases taking up the question of abstention from political questions, compels the same result. To the extent our prior cases suggest a contrary result, they must yield.

To be sure, courts must take great care in wading deeply into questions of social and economic policy, which we long have recognized as fitting poorly with the judiciary's institutional competencies. *See, e.g., Martin v. Unemployment Comp. Bd. of Review*, 466 A.2d 107, 111-13 (Pa. 1963). However, the judiciary has a correlative and equally important obligation to fulfill its interpretive function. It bears repeating that the political question doctrine in Pennsylvania is of wholly prudential cloth, and hence must be considered anew each time it is invoked. *See supra* at 37-38. It is a mistake to conflate legislative policy-making pursuant to a constitutional mandate with constitutional interpretation of that mandate and the minimum that it requires. In this domain, as in so many others, courts have the capacity to differentiate a constitutional threshold, which ultimately is ours to determine, from the particular policy needs of a given moment, which lie within the General Assembly's purview. The array of courts that have done precisely that in this arena suggests that our assessment in this regard is neither imprudent nor uncommon.

It is fair neither to the people of the Commonwealth nor to the General Assembly itself to expect that body to police its own fulfillment of its constitutional mandate. This is especially so in light of the many competing and not infrequently incompatible demands our legislators face to satisfy non-constitutional needs, appease dissatisfied

constituents, and balance a limited budget in a way that will placate a majority of members in both chambers despite innumerable differences regarding policy and priority. *Cf. Sweeney*, 375 A.2d at 710 (quoting R. Brooke Jackson, *The Political Question Doctrine*, 44 U. COLO. L. REV. 477, 501 (1974)) ("One does not think of [the legislature] as functionally equipped or designed to interpret the Constitution without review, nor under our system, does one wish to leave to [the legislature] unbridled authority to determine the constitutionality of its own acts."). Judicial oversight must be commensurate with the priority reflected in the fact that for centuries our charter has featured some form of educational mandate. Otherwise, it is all but inevitable that the obligation to support and maintain a "thorough and efficient system of public education" will jostle on equal terms with non-constitutional considerations that the people deemed unworthy of embodying in their Constitution. We cannot avoid our responsibility to monitor the General Assembly's efforts in service of its mandate and to measure those effects against the constitutional imperative, ensuring that non-constitutional considerations never prevail over that mandate.

Similarly, and for the reasons stated, we find colorable Petitioners' allegation that the General Assembly imposes a classification whereunder distribution of state funds results in widespread deprivations in economically disadvantaged districts of the resources necessary to attain a constitutionally adequate education. Accordingly, the Commonwealth Court erred in determining that Petitioners' equal protection claims are non-justiciable. Whether Petitioners' equal protection claims are viewed as intertwined with their Education Clause claims or assessed independently, those claims are not subject to judicial abstention under the political question doctrine. It remains for

Petitioners to substantiate and elucidate the classification at issue and to establish the nature of the right to education, if any, to determine what standard of review the lower court must employ to evaluate their challenge. But Petitioners are entitled to the opportunity to do so.

The Commonwealth Court's order sustaining the Commonwealth's preliminary objections is reversed. This case is remanded for further proceedings consistent with this Opinion.

Justices Todd, Donohue, Dougherty and Mundy join the opinion.

Justice Dougherty files a concurring opinion.

Chief Justice Saylor files a dissenting opinion.

Justice Baer files a dissenting opinion.